Rhea DOPICO, David Dopico, Muriel Zgardowsky and Vincent Zgardowsky, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Neil E. GOLDSCHMIDT, individually and in his capacity as Secretary of the Unit-ed States Department of Transporta-tion; Theodore C. Lutz, individually and in his capacity as Administrator of the United States Urban Mass Transporta-tion Administration; Hiram J. Walker, individually and in his official capacity as Regional Director of the Urban Mass Transportation Administration, Region

II; Tri-State Regional Planning Commission; Metropolitan Transportation Authority; New York City Transit Authority; Manhattan and Bronx Surface Transit Operating Authority; Staten Island Rapid Transit Operating Authority; Richard Ravitch, individually and in his capacity as Chairman of the Board of the Metropolitan Transportation Authority; Lawrence R. Bailey, Carol Bellamy, Stephen Berger, David W. Brown, Jane K. Butcher, Herbert J. Libert, John F. McAlevey, Ronay Menschel, Daniel T. Scannell, William J. Sheridan, Constantine Sidamon-Eristoff, Robert F. Wagner, Jr., and Robert T. Waldbauer, as Members of the Board of the Metropolitan Transportation Authority, New York City Transit Authority, and Manhattan and Bronx Surface Transit Operating Authority; John D. Simpson, individually and in his capacity as Executive Director of the Metropolitan Transportation Authority; Edward I. Koch, individually and in his capacity as Mayor of the City of New York; New York City Department of Transportation; and Anthony Ameruso, individually and in his capacity as Commissioner of the New York City Department of Transportation, Defendants.

DISABLED IN ACTION OF METROPOLITAN NEW YORK, Joseph Deriso, Vincent Venditti, Sally Wetzler, and Bernadino Delacruz, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Neil E. GOLDSCHMIDT, individually and in his capacity as Secretary of the United States Department of Transportation; Theodore C. Lutz, individually and in his capacity as Administrator of the United States Urban Mass Transportation Administration; Hiram J. Walker, individually and in his capacity as Regional Director of the Urban Mass Transportation Administration, Region II; Metropolitan Transportation Authority; New York City Transit Authority; Manhattan and Bronx Surface

Transit Operating Authority; Richard Ravitch, individually and in his capacity as Chairman of the Metropolitan Transportation Authority; Lawrence R. Bailey, Carol Bellamy, Stephen Berger, David W. Brown, Jane K. Butcher, Herbert J. Libert, John F. McAlevey, Ronay Menschel, Daniel T. Scannell, William J. Sheridan, Constantine Sidamon-Eristoff, Robert F. Wagner, Jr., and Robert T. Waldbauer, as Members of the Board of the Metropolitan Transportation Authority, New York City Transit Authority, and Manhattan and Bronx Surface Transit Operating Authority; John D. Simpson, individually and in his capacity as Executive Director of the Metropolitan Transportation Authority; Edward I. Koch, individually and in his capacity as Mayor of the City of New York; New York City Department of Transportation; and Anthony Ameruso, individually and in his capacity as Commissioner of the New York City Department of Transportation, Defendants.

Nos. 80 Civ. 4562, 80 Civ. 4862.

United States District Court,
S. D. New York.

July 24, 1981.

Brooklyn Legal Services Corporation B, Brooklyn, N. Y., Community Action for Legal Services, Inc., Handicapped Persons Legal Support Unit, Winthrop, Stimson, Putnam & Roberts, New York City, for plaintiffs; John C. Gray, Jr., George W. Sampson, Jane Greengold Stevens, Brooklyn, N. Y., Susan Sugar Nathan, Howard G. Lane, Norman Spiegel, Sutton Keany, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for defendants Goldschmidt, Lutz and Walker; Jane E. Bloom, Asst. U. S. Atty., New York City, of counsel.

Cahill Gordon & Reindel, New York City, for defendants MTA, NYCTA, MABSTOA, SIRTOA, Ravitch, Bailey, Bellamy, Berger, Brown, Butcher, Libert, McAlevey, Menschel, Scannell, Sheridan, Sidamon-Eristoff, Wagner, Waldbauer and Simpson; Floyd Abrams, Dean Ringel, Thomas R. Jones, Susan Buckley, Devereux Chatillon, New York City, of counsel.

Allen G. Schwartz, Corp. Counsel, City of New York, New York City, for defendants Koch, NYCDOT and Ameruso; David Drueding, Asst. Corp. Counsel, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

These are consolidated class actions in which plaintiffs, individually and representing all wheelchair-bound handicapped individuals, seek declaratory and injunctive relief to compel the defendants to comply with various statutes and regulations enacted by the Congress to implement the policy that the handicapped have the same right as other persons to use mass transportation facilities and services.

The defendants fall into two categories, federal and local. The defendants Goldschmidt, Lutz and Walker, officials of the United States Department of Transportation ("DOT") and the Urban Mass Transportation Administration ("UMTA"), will be collectively referred to as the "federal defendants" or, alternatively, as UMTA; the remaining defendants, the Metropolitan Transportation Authority ("MTA"), the New York City Transit Authority ("TA"), the New York City Department of Transportation ("NYCDOT"), and other authorities and agencies, their members, and members of the City government, will be collectively referred to as the "local defendants." The federal defendants grant mass transit assistance to local communities pursuant to statutes and regulations promulgated thereunder; the local defendants are the recipients of such funds, which are granted pursuant to appropriate applications to the federal agencies.

The essence of the claims against the local defendants is that they have deprived

wheelchair users of mass transportation by failing to provide an accessible system for them.[1] The essence of the claims against the federal defendants is that they have approved transit grants to the local defendants when they knew or should have known that those defendants had failed to make satisfactory "special efforts,"[2] as required by statutes, to provide accessible transportation to the handicapped. In consequence, plaintiffs claim that the practice of the defendants prevents the integration of class members into the mainstream of society, impairs their employment and educational opportunities, and deprives them of their rights under statutes enacted for their benefit and under the Fifth and Fourteenth Amendments of the United States Constitution.

### The Requested Relief

Plaintiffs seek declaratory and injunctive relief that would, among other matters, require this Court to appoint a special master to make recommendations to the Court with respect to (i) the determination of the amount of funds defendants failed to spend or misspent on "special efforts"; (ii) oversee consultation with plaintiffs' class and their representatives by the defendants; (iii) monitor and report to the Court on defendants' implementation of required plans until the system is accessible; (iv) recommend to the Court any additional orders which the special master believes necessary to enforce the rights of the plaintiffs' class. Further, plaintiffs seek expenditure of "special efforts" funds and ask that this Court retain jurisdiction until all the requirements of the Court and the judgment to be entered herein are satisfied.

There are two motions now before the Court. The local defendants move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaints for failure to state a claim upon which relief can be granted; the federal defendants move pursuant to Rule 56 for summary judgment. While involving the same statutes and regulations, the motions present in most respects fundamentally different issues and so they will be considered separately (just as they have been briefed separately).

### The Statutes

Federal assistance to states and localities for mass transit is generally provided under § 3 of the Urban Mass Transportation Act of 1964 (as amended) (the "UMT Act")[3] for discretionary capital grants, § 5 of the UMT Act[4] for operating and capital subsidies pursuant to a federal formula, and under the mass transportation provisions of the Federal-Aid Highway Act of 1973 (as amended).[5]

Beginning in 1970, Congress enacted various provisions with the goal of advancing the rights of the elderly and handicapped persons in the use of public mass transportation. Thus, in 1970, Congress passed § 16 of the UMT Act, which declares it to be national policy

> that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and

---

1. "Accessible," with respect to vehicles and other moving conveyances, and existing facilities, means "able to be entered and used by a handicapped person." 49 C.F.R. § 27.5.

2. "Special efforts" are affirmative actions to provide mass transportation services to the elderly and the handicapped. 49 U.S.C. § 1612(a). Special efforts "in planning means genuine, good-faith progress in planning service for wheelchair users ... that is reasonable by comparison with the service provided to the general public and that meets a significant fraction of the actual transportation needs of such persons within a reasonable time period." 23 C.F.R. Pt. 450, Subpt. A, App. B.

3. 49 U.S.C. § 1602.

4. 49 U.S.C. § 1604.

5. 23 U.S.C. §§ 103(e)(4), 142. Projects funded under 49 U.S.C. § 1604 receive up to 80% federal funding for construction and up to 50% for operating costs, id. § 1604(e); projects funded under id. § 1602 receive 80% federal funding, id. § 1603(a); projects funded under 23 U.S.C. § 103(e)(4) receive up to 85% federal funding, id.; and, projects funded under 23 U.S.C. § 142(a) & (c) receive up to 75% federal funding, id., see 23 U.S.C. § 120(a).

services; that special efforts shall be made in the planning and designing of [such] facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured.[6]

Further, the section provides that all programs assisting mass transit should contain provisions implementing this policy.

In 1973, Congress passed § 504 of the Rehabilitation Act of 1973, patterned after Title VI of the Civil Rights Act of 1964, which, as amended, provides that

[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[7]

The Federal-Aid Highway Act of 1973, as amended in 1974, provides that transportation projects funded under that Act must be planned, designed, constructed, and operated to allow effective utilization by, among others, the non-ambulatory wheelchair-bound, and the Secretary of Transportation shall not approve any program not complying with these provisions.[8]

Plaintiffs predicate their claims upon these statutes, the regulations promulgated thereunder, and also under § 315 of the Department of Transportation and Related Agencies Appropriations Act of 1975, which provides that no funds available under the Act for the fiscal year ending June 30, 1975 shall be authorized for the purchase of subway cars or buses unless they are designed to meet the needs of the elderly and handicapped.[9] Taken together, these statutes in-dicate that the Congressional approach for achieving the national goal of effective and efficient transportation for all citizens is based upon federal funding and administrative oversight of local planning.

### The Regulations

There are two basic sets of regulations promulgated in furtherance of the above statutes.[10] The first, which became effective in 1976, are known as the "special efforts" regulations. They required the creation of a Metropolitan Planning Organization ("MPO"), which, in New York, is the Tri-State Regional Planning Commission, a defendant herein. The MPO is responsible "for carrying out the urban transportation planning process . . . and shall develop the planning work programs, transportation plan, and improvement program [("TIP")] . . . [and] shall be the forum for cooperative decisionmaking by principal elected officials."[11] The TIP is a "staged multiyear program of transportation improvements including an annual element."[12] "Annual element" is defined as "a list of transportation improvement projects proposed for implementation during the first program year."[13] The purpose of the TIP is to identify transportation improvements for a particular program period, indicate priorities, estimate costs, and group improvements of similar urgency.[14] The annual element of the TIP sets forth the projects being funded for that fiscal year.[15]

UMTA must determine that a program conforms to the regulations and thus certify it for federal funding.[16] Among other things, the TIP must include satisfactory "special efforts" in planning public mass-transit facilities so that they can effectively be used by the elderly and the handi-

---

**6.** 49 U.S.C. § 1612(a).

**7.** 29 U.S.C. § 794.

**8.** Pub.L. No. 93–87, § 165(b), as amended by Pub.L. No. 93–643, § 105.

**9.** Pub.L. No. 93–391, § 315, *reprinted in* [1974] U.S.Code Cong. & Ad.News, 878, 888–889.

**10.** 49 C.F.R. Part 613; 23 C.F.R. Part 450.

**11.** 23 C.F.R. § 450.112(a).

**12.** *Id.* § 450.304.

**13.** *Id.* § 450.304(b).

**14.** *Id.* § 450.308.

**15.** *Id.* § 450.310–312.

**16.** *Id.* § 450.320.

capped.[17] Thus, the locality must demonstrate genuine, good-faith progress in planning services for disabled persons [18] and "reasonable progress" in implementing previously approved projects.[19]

The second set of regulations was promulgated in 1979. They were necessitated when President Ford directed the Department of Health, Education and Welfare to establish guidelines for all agencies in implementing § 504 of the Rehabilitation Act.[20] The HEW guidelines require "mainstreaming" the handicapped and permit separate treatment only when necessary. "In the context of public transportation, 'mainstreaming' means the physical integration of the handicapped with other members of the traveling public."[21] Thus, in the mass transportation area, each mode of transportation must be accessible to the handicapped.[22] Inasmuch as the "special efforts" regulations did not require such mainstreaming, DOT was compelled to promulgate new regulations.

These were issued pursuant mainly to § 504 of the Rehabilitation Act and also pursuant to § 16 of the UMT Act and § 165(b) of the Federal-Aid Highway Act.[23] They are known as the "504 regulations" and mandate, with certain exceptions, that transportation systems be made accessible by July 2, 1982.[24] A program is deemed to have achieved accessibility "when viewed in the entirety, it is accessible to handicapped persons." [25] The regulations establish various criteria for determining when the different kinds of mass transit shall be deemed to have achieved "program accessibility."

Thus, a fixed-route bus system [26] has achieved "program accessibility" when it is accessible to handicapped persons who can use steps and when the system, viewed in its entirety, is accessible to wheelchair users; with respect to the latter aspect, this means that "at least one-half of the peak-hour bus service must be accessible and accessible buses must be used before inaccessible buses during off-peak hours." [27] While the deadline to achieve this goal is July 2, 1982, extraordinary structural changes to, or replacement of, existing equipment need not be accomplished for ten years.[28] Similarly, subways must achieve accessibility by July 2, 1982, but extraordinary structural changes may be made over a period of thirty years, provided that steady progress toward accessibility be made during that time. With respect to subway station accessibility, all stations must be accessible to handicapped persons who use steps, and "key" stations (those with heavy usage, at transfer and end points, and serving major activity centers like schools and health-care facilities) must be accessible to wheelchair users.[29]

If full program accessibility is not achieved by July 2, 1982, then there must be assurance of interim program accessibility

---

17. *Id.* § 450.120(a)(5).

18. 23 C.F.R. Pt. 450, Subpt. A, App. B.

19. 49 C.F.R. § 613.202(c).

20. Executive Order No. 11,914, 41 Fed.Reg. 17,-871 (1976).

21. *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272, at 1276 (D.C.Cir. 1981).

22. 45 C.F.R. §§ 85.1–85.58 (1980). For a discussion of the impact and consequences of the HEW regulations, see *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272, at 1273–1276 (D.C.Cir. 1981).

23. These regulations have been struck down by the District of Columbia Court of Appeals insofar as they are based on § 504. The court

remanded to DOT to indicate squarely if they are also based on the other statutes indicated. *American Public Transit Ass'n v. Lewis,* 655 F.2d 1272 (D.C.Cir. 1981). The effect of this decision will be considered *infra.*

24. 49 C.F.R. § 27.95(a).

25. *Id.* § 27.65(a).

26. This "means a system of buses of any size which operate on a fixed route pattern on a fixed schedule." *Id.* § 27.5.

27. *Id.* § 27.85(a)(1).

28. *Id.* § 27.85(a)(2).

29. *Id.* § 27.87(a)(4).

until full accessibility is achieved. The standards for interim accessibility are to be developed in cooperation with a local advisory group of the handicapped, and during the interim period states and localities must spend two percent of the funds received pursuant to § 5 of the UMT Act [30] on interim transportation.[31]

The regulations also provide for paratransit systems, which are "those forms of collective passenger transportation which provide shared-ride service to the general public or special categories of users on a regular basis and which do not necessarily operate on fixed schedules or over prescribed routes." [32] Paratransit systems have the same program accessibility requirements as other components of public transportation.[33]

### Plaintiffs' Claims

Plaintiffs, as already noted, allege violations of the above statutes and regulations and also of the Federal Constitution. In broad sweep, they allege that although no special efforts were made between 1970 and 1976 by the local defendants to plan and design accessible public mass transportation in New York City, the federal defendants continued to fund the programs of the local defendants. However, their charges focus primarily upon alleged "special efforts" shortcomings in specific fiscal years. An outline of plaintiffs' claims with respect to the TIP of each fiscal year is necessary in order to understand the rights which they claim were violated and the defendants' motions challenging the asserted claims.

### Fiscal Year 1977–78

The TIP for this fiscal year contemplated the purchase of one hundred minibuses to be equipped with level-change devices and safety and accessibility features for wheelchair users. The buses were to be run on fixed routes selected by a special task force. The project was budgeted at $5,000,000.

Plaintiffs charge that although the minibus project was to be used by able-bodied as well as handicapped persons, the local defendants attributed the entire cost, not just the accessibility features, to "special efforts." They further charge that the federal defendants approved the project not only in disregard of the recommendations of the disabled community but also upon an erroneous determination that the minibus program satisfied the special-efforts requirements based upon a finding that the local defendants had designed and planned an urban mass transportation system which assured accessibility to handicapped persons, including wheelchair users. The plaintiffs further allege that the federal defendants, contrary to a long-standing practice, in this instance allowed the local defendants to allocate the entire cost of the minibuses against their special-efforts obligations.

The only bid for the minibus project was $8,750,000, which was 75% higher than the $5,000,000 budgeted. Thus, in May 1980, UMTA permitted the local defendants to switch the funds previously allotted to the minibus project to the purchase and installation of hydraulic wheelchair lifts on 200 of 837 Grumman Flexible buses previously ordered in March 1979 and the purchase of seven additional buses equipped with lifts. UMTA deemed this amendment to satisfy fully the special-efforts requirements for 1977–78.

Plaintiffs, however, press their original claim; they allege that defendants have failed to comply with their special-efforts obligations with respect to the funds made available, although not used, for the aborted minibus program. They charge that the more than two-and-a-half year delay that ensued between the approval of the minibus project and approval of the wheelchair-lift substitution, was the result of ineptitude and poor planning by the local defendants; that when the switch was made for the installation of the 200 hydraulic lifts on previously ordered buses and the purchase

**30.** 49 U.S.C. § 1604.

**31.** 49 C.F.R. § 27.97.

**32.** *Id.* § 27.5.

**33.** *Id.* § 27.91.

of seven new buses, the handicapped groups were not consulted; that in the instance of the seven new buses, the full cost thereof was credited to "special efforts" although the major portion of the cost was not for the benefit of the elderly or handicapped. The ultimate grievance is that although $5,000,000 has been budgeted for "special efforts" within the above fiscal period, the earliest that accessible transportation can be expected is sometime in 1981.

### Fiscal Year 1978–79

The major special-effort feature of the annual element of this fiscal year's TIP was a paratransit service system, a supplement to public mass transit that provides door-to-door transportation using taxi services or vans. After a preliminary review by UMTA in the summer of 1978 indicated that the City was not demonstrating sufficient special efforts, Mayor Koch on November 1, 1978 issued a special directive to the NYCDOT to develop and implement a paratransit system to meet the special-efforts requirements. The paratransit program was to operate on a subscription basis, upon advance reservation, and also on demand. The system would function for only seventeen hours per day in contrast to the City's mass transit system, which requires no reservation and operates twenty-four hours per day. The program was contemplated as part of an accessible multi-modal transportation system for the entire City. The concept was to provide "high quality coordinated transportation services."

Largely in reliance on the Koch directive, UMTA approved the TIP for this fiscal year with conditions, including a requirement that the local defendants implement the paratransit program by January 1, 1980. The plaintiffs charge that with the exception of an implementation schedule, the local defendants have failed to meet the conditions of approval; that the schedule failed to provide for prompt initiation of "13(c) negotiations" with labor unions as required by 49 U.S.C. § 1609; that UMTA failed to monitor closely the local defendants' progress in implementation of the paratransit plan; that the local defendants

have not only failed to implement the plan on the scheduled dates but that no new implementation date has been set and no funds have as yet been expended for the purchase of paratransit services or equipment; and that the entire plan is inadequate since it is based upon an incorrect estimate as to the population and trip demand of handicapped persons in New York City.

### Fiscal Year 1979–80

The major special-efforts component of this year's TIP was the same paratransit system as in the last year's. Although implementation of the program had been substantially delayed, UMTA determined that there was sufficient evidence of reasonable progress to find that the special-efforts requirements were being satisfied. This was based in part on the role of the paratransit system as the part of the entire highly coordinated system that tied the special-efforts program together.

Plaintiffs, in addition to continuing their fundamental objections to the paratransit system, contended that UMTA approved it as satisfying the special-efforts requirements though there was no tangible evidence of progress. Not only had no funds from the previous year actually been spent, plaintiffs charge, but, at the time the 1979–80 TIP was approved, NYCDOT had already reduced the number of vehicles to be in the paratransit program without informing UMTA.

### Fiscal Year 1980–81

The TIP for this fiscal year, approved only two months after the prior year's, is taken almost verbatim from the previous year's. Thus, UMTA again justified approval of the paratransit system toward the special-efforts requirements on the basis of its importance, delays beyond the City's control, and the Mayor's stated commitment to the system. Moreover, UMTA noted that the City's order of 532 new accessible buses, the lifts of which cost $5,300,000, was enough to satisfy the special-efforts requirement.

Plaintiffs press the same objections to the system as before, and furthermore criticize

the TIP as demonstrating that UMTA had not seriously reexamined the City's efforts in special-efforts planning.

### Local Defendants' Motion to Dismiss the Complaints

The local defendants, in urging dismissal of plaintiffs' claims, contend in general that, under their prayer for relief, plaintiffs seek a restructuring of New York City's vast transit system under court supervision and argue that the statutes relied upon either do not provide them with a private right of action to warrant the requested relief, or else do not permit the kind of relief sought.

### § 16 of the UMT Act

First, defendants contend that § 16 of the Urban Mass Transportation Act of 1964[34] does not endow plaintiffs with a private right of action to enforce compliance with its provisions. The essence of their argument is that the declaration of national policy set forth in § 16 that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services, does not create any duty running directly to the handicapped, but that it does specifically impose a duty upon the Secretary of Transportation to execute a federal funding program in order to effectuate the declared policy. They argue that the clear thrust of the statute is directed toward those who administer the program to ensure the implementation of the national goal, thereby negating any congressional intent to confer an independent private right of action in favor of any individual intended to be benefitted by the program.

With the statute and its history here silent on the issue, the Court is required to decide whether Congress intended to create a federal right of action in favor of the handicapped, the class of individuals which was the object of its concern. This is a matter of statutory construction. The mere fact that, as plaintiffs allege, and for the purposes of this motion must be accepted, the local and federal defendants failed to discharge their obligations under the Act and thereby deprived plaintiffs of its intended benefits "does not automatically give rise to a private cause of action in favor of [them]."[35] On the other hand, the failure of Congress expressly to specify an intent to create a private action "is not inconsistent with an intent on its part to have such a remedy available to the persons benefited by its legislation."[36]

■ The criteria for implying a private right of action where Congress has failed to provide expressly for one are enumerated in *Cort v. Ash*:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law ... so that it would be inappropriate to infer a cause of action based solely on federal law?[37]

However, recent decisions of the Supreme Court have cast some doubt on the continued vitality of these four specifics, though the Court still adheres to this approach.[38]

---

**34.** 49 U.S.C. § 1612.

**35.** *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979).

**36.** *Id.* at 717, 99 S.Ct. at 1968.

**37.** 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

**38.** *Compare California v. Sierra Club,* —— U.S. - - , 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101

(1981) (Stevens, J., concurring) ("The *Cort v. Ash* analysis is ... a part of our law.") *and Universities Research Ass'n v. Coutu,* —— U.S. ——, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981), *with California v. Sierra Club,* —— U.S. ——, 101 S.Ct. 1775, 1783, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring in the judgment) ("I think the Court's opinion places somewhat more emphasis on *Cort v. Ash* ... than is warranted.")

The ultimate basic inquiry is to divine the intent of Congress to create the claimed private right of action.[39]

Analysis starts with the language of the statute itself.[40] There can be no doubt that the declaration contained therein makes it clear that the statute was intended for the benefit of the handicapped and elderly in the use of mass transportation, and that plaintiffs are members of the benefitted class.[41] But that does not end inquiry; rather, it leads to the ultimate question whether Congress intended that it be enforced through private litigation. The legislative history itself furnishes no indication, explicit or implicit, with respect to creation or denial of a private cause of action in favor of those the Act intended to benefit where it is charged public officials failed to effectuate implementing programs.[42] This is not surprising since "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." [43]

Further, § 16 does not parallel a prior legislative act which may have previously been the subject of court rulings upholding a private right of action and of which Congress was aware. Neither was there any previous determination by agencies entrusted with carrying out an act which recognized a private right (and so also presumably within the knowledge of the Congress that passed § 16) such that the Court can infer that Congress intended to extend the private right to § 16.[44]

We need not tarry long on the factor as to whether the cause of action is one traditionally relegated to the states. To be sure, the operation of bus lines, subway systems, and other forms of local transportation originally were in the main the function of private enterprise, but, in modern years, they have been undertaken in large measure by local, state, and regional bodies in the public interest. The rapidly expanding metropolitan and other urban areas which generally cross the boundary lines of local jurisdictions and extend interstate, and the deterioration or inadequate provision of transportation facilities, soon led to federal aid programs like those provided for by the UMT Act. With state, regional, and local areas dependent upon capital and operating

---

**39.** *California v. Sierra Club,* —— U.S. ——, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981); *Universities Research Ass'n v. Coutu,* —— U.S. ——, 101 S.Ct. 1451, 1461, 67 L.Ed.2d 662 (1981); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Leist v. Simplot,* 638 F.2d 283, 302–03 n.20 (2d Cir. 1980) (Friendly, J.), *cert. granted,* 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981) ("the basic inquiry is always to plumb the intent of Congress, that the *Cort* factors are simply inquiries helpful in that endeavor").

**40.** *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 689, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979).

**41.** Local defendants' emphasis on the statutory words "[i]t is hereby declared to be" as not directly imposing duties or prohibiting conduct, is without merit. First, the statute is obviously meant for the "especial benefit" of plaintiffs' class. Second, other statutes that have merely declaratory language have been held to create a private right of action. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 61, 98 S.Ct. 1670,

1678, 56 L.Ed.2d 106 (1978) (citing *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 238–40, 90 S.Ct. 400, 405–406, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 414 n.13, 88 S.Ct. 2186, 2189 n.13, 20 L.Ed.2d 1189 (1968).

**42.** The legislative history is virtually barren on this subject. Section 16 was introduced on the floor of the House by Rep. Biaggi, who viewed it as continuing the federal policy of removing structural barriers. 116 Cong.Rec. 34180–81 (1970) (remarks of Rep. Biaggi).

**43.** *Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979).

**44.** *Cf. id.* at 696–98, 99 S.Ct. at 1957–1958; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); *Leist v. Simplot,* 638 F.2d 283, 303 (2d Cir. 1980) (Friendly, J.), *cert. granted,* 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981). *See Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 869, 55 L.Ed.2d 40 (1978).

grants and subsidies from the federal government, it can hardly be urged, in light of the multiple regulations that arise thereunder, that the function at issue is one traditionally relegated to the states.

Thus, there remains the factor, is it consistent with the underlying purpose of the legislation to imply a private right of action in favor of the plaintiffs? To qualify for federal financial aid, local transportation systems must meet complex requirements under regulations involving difficult administrative and executive decisions. Thus the local authorities are required to submit a transportation plan "consistent with the area's comprehensive long-range land use plan, urban development objectives, and the area's overall social, economic, environmental, system performance, and energy goals and objectives." [45] On the other hand, federal agencies before granting financial assistance determine whether the local agencies satisfy statutory and regulatory requirements.

With such complex matters involving an interrelated maze of governmental decisions at many levels, some of which plaintiffs here attack, implying a private cause of action is not consistent with the underlying purpose of the legislative scheme, would upset the delicate balance of administrative and local decisionmaking, and would risk the possibility of inconsistent results in different areas of the country.

Here, for example, the plaintiffs contend that the special effort for the fiscal year 1977–78, the minibus project, was aborted because a bid exceeded the authorized amount of $5,000,000, and further that the local agencies improperly charged, and the federal agencies allowed contrary to a long-standing policy, the allocation of the funds for a purpose that did not constitute a special effort. Did Congress intend that such a claim give rise to a private cause of action to force the agencies to reallocate the funds or to direct their proper attribution? Did Congress intend that the Court intervene at the instance of a private litigant to remedy the alleged grievance? [46] As one court has asked,

What must be done to provide handicapped persons with the same right to utilize mass transportation facilities as other persons? Does each bus have to have special capacity? Must each seat on each bus be removable? Must the bus routes be changed to provide stops at all hospitals, therapy centers and nursing homes? Is it required that buses be able to accommodate bedridden persons? Is it discriminatory to answer any of these questions in the negative? Will the operation of hydraulic lifts on buses involve stigmatizing effects on the persons who use them? . . .

These few questions illustrate the enormous difficulties which would be encountered by any attempt to . . . [decide] through the judicial process. Those difficulties would be compounded by the fact that these are national laws and national programs. Conflicting or even different interpretations in different courts within the federal judicial structure would result in a paralysis . . . until the matter finally reached the Supreme Court. The delay attendant upon that process may not only disadvantage the handicapped, it could halt or hinder the country's entire mass transportation system.[47]

Thus, if, as plaintiffs claim, either or both the federal and local agencies were derelict in failing to carry out the purposes of the legislative act insofar as they were intended for the benefit of this group of plaintiffs, responsibility for its proper enforcement and administration rests with the executive. On this aspect of the motion, it is not without interest that plaintiffs, in opposition to the federal defendants' motion for summary judgment discussed hereafter, challenge

45. 23 C.F.R. § 450.116(d); *see generally id.*, Pt. 450, Subpt. A.

46. *Cf. Cannon v. University of Chicago*, 441 U.S. 677, 742–49, 99 S.Ct. 1946, 1981–1985, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting).

47. *Atlantis Community, Inc. v. Adams*, 453 F.Supp. 825, 831 (D.Colo.1978).

all the funding decisions by the federal agencies from 1970 to the present and urge that, under a de novo standard of review, the reasonableness of those agencies' decisions, based upon all the surrounding circumstances, are issues to be decided by this Court.

■ The Court holds that § 16 of the UMT Act does not create a private right of action in favor of plaintiffs [48] and, accordingly, this branch of their complaints is dismissed.[49]

### § 504

The local defendants next contend that plaintiffs do not state a claim for which relief can be granted under § 504 of the Rehabilitation Act of 1973,[50] which provides that "[n]o otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." They urge that that section is a nondiscrimination statute that does not mandate affirmative action of the kind sought by plaintiffs.[51]

The starting point in this inquiry is *Southeastern Community College v. Davis*,[52] the only decision of the Supreme Court interpreting § 504. There, a deaf woman applied for admission to a college nursing program which received federal funds. After evaluation by an audiologist, the school rejected her application because it claimed her deafness would prevent her from performing in the clinical program and also she would not be able to perform certain functions required of a nurse. Davis argued that the school should not have taken her handicap into consideration at all in considering her application—that is, in determining if she was "otherwise qualified"—and also that it should have restructured its program so that her deafness would not preclude her participation.

The Supreme Court held that § 504 simply says that the "mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context."[53] Thus, it held that "otherwise qualified" means that the person is able to meet all the requirements of a pro-

---

**48.** *Leary v. Crapsey*, 566 F.2d 863 (2d Cir. 1977), does not compel a different result. In that action brought pursuant to both § 16 and § 504 of the Rehabilitation Act of 1973, the Court of Appeals remanded to the district court in large measure because that court did not analyze the actions of the defendants and so there was nothing for the Court of Appeals to review. The Court was silent as to the existence of a private right of action under § 16 though it held one existed under § 504. The Court expressed no view on the merits, and its opinion does not support the implication of a private right of action under § 16. *See United Handicapped Fed'n v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Lloyd v. Regional Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977); *Vanko v. Finley*, 440 F.Supp. 656 (N.D.Ohio 1977).

**49.** Upon the argument of this motion, plaintiffs conceded that § 165(b) of the Federal-Aid Highway Act of 1973 and § 315 of the Department of Transportation and Related Agencies Act of 1975 do not create a private right of action in their favor.

**50.** 29 U.S.C. § 794.

**51.** Defendants concede that, as currently interpreted, § 504 supports a private right of action.

The Supreme Court has never addressed the question, which it reserved expressly in its only substantive interpretation of § 504, *Southeastern Community College v. Davis*, 442 U.S. 397, 404–05 n.5, 99 S.Ct. 2361, 2366 n.5, 60 L.Ed.2d 980 (1979). The Court granted *certiorari* in a case this past Term to consider the question but instead held that the issues before the Court were moot. *University of Texas v. Camenisch*, —— U.S. ——, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Several courts of appeals, however, have indicated that a private right of action under § 504 exists. *E. g., Baker v. Bell*, 630 F.2d 1046, 1055 (5th Cir. 1980); *United Handicapped Fed'n v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Leary v. Crapsey*, 566 F.2d 863 (2d Cir. 1977); *Lloyd v. Regional Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977). *But see Simpson v. Reynolds Metals Co.*, 629 F.2d 1226 (7th Cir. 1980); *Trageser v. Libbie Rehab. Center, Inc.*, 590 F.2d 87 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979).

**52.** 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979).

**53.** *Id.* at 405, 99 S.Ct. at 2366.

gram despite a handicap.[54] A program is not required by § 504 to take substantial affirmative action to remove barriers to the handicapped; the statute does not require a "fundamental alteration in the nature of the program." If governing regulations "were to require substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals, they would do more than qualify the meaning of § 504. Instead, they would constitute an unauthorized extension of the obligations imposed by that statute."[55] The Supreme Court did not impose an absolute ban on affirmative action; indeed, the Court recognized that the line between a lawful refusal to take some affirmative action and illegal discrimination might not always be easy to draw, and that merely adhering to the status quo might in some cases arbitrarily deprive an "otherwise qualified" handicapped person of a chance to participate. However, a program would not be required to lower its standards substantially or incur "undue financial and administrative burdens."[56]

Courts since *Davis* must thus consider the kind of action sought to remedy alleged discrimination against the handicapped to determine if it is permitted by § 504. The Fifth Circuit Court of Appeals, in two opinions since *Davis*, has provided relief to plaintiffs where the remedy would not require substantial adjustments in the existing programs and would not impose undue financial burdens.[57]

The only post-*Davis* case involving mass transportation and considering *Davis*' implications is *American Public Transit Association v. Lewis ("APTA")*,[58] in which the District of Columbia Court of Appeals invalidated the 1979 DOT regulations insofar as they were promulgated pursuant to § 504. After tracing at great length the history of the regulations and their evolution from mandating "special efforts" to "accessibility," the Court of Appeals held that the regulations were an invalid implementation of § 504 because they "require extensive modifications of existing systems and impose extremely heavy financial burdens on local transit authorities."[59] The court continued:

> Every new bus or subway car must be accessible to wheelchairs regardless of cost; elevators and other modifications must be added to existing subways. The regulations themselves recognize that some changes will be "extraordinarily expensive"; such changes are nevertheless required, though they may be phased in over periods of time longer than the three-year limit otherwise applicable. . . . These are the kind of burdensome modifications that the *Davis* Court held to be beyond the scope of section 504.[60]

Thus, although the Court of Appeals recognized that "at some point a transit system's refusal to take modest, affirmative steps to accommodate handicapped persons might well violate § 504,"[61] the current regulations simply imposed too massive an obligation upon recipients of federal funds and thus violated § 504 as interpreted in *Davis*. This view applies with equal force to the case at bar. Plaintiffs, as noted earlier, are seeking massive relief involving extra-ordinary expenditures; they seek to compel compliance with the regulations in

54. *Id.* at 406, 99 S.Ct. at 2367.

55. *Id.* at 409-10, 99 S.Ct. at 2369.

56. *Id.* at 412-13, 99 S.Ct. at 2370.

57. *Tatro v. State of Texas*, 625 F.2d 557 (5th Cir. 1980) (§ 504 requires school to provide catheterization to four-year old child who would not otherwise be able to participate in school programs but who, with catherization, would be able to realize full benefits of school program; court notes outcome might be different if kidney dialysis were required); *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980), *remanded*, —— U.S. ——, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (university required under § 504 to provide deaf graduate student with sign-language interpreter).

58. 655 F.2d 1272 (D.C.Cir. 1981).

59. *Id.* at 1277-78.

60. *Id.* at 1277-78.

61. *Id.* at 1277-78.

all respects. Just as the *APTA* court viewed the regulations as violative of § 504 because of the affirmative obligations they impose on localities, so, too, does this Court hold that the relief requested in this action would constitute the "kind of burdensome modifications that the *Davis* Court held to be beyond the scope of section 504."

Although it may be true that "the application of section 504 to public transportation systems raises some questions that are significantly different from those considered by the Supreme Court in the higher education setting in . . . *Davis* . . . [and that it may be] much more difficult to avoid 'discrimination' without taking some kind of 'affirmative action' " in the public transportation context,[62] nevertheless there is no mistaking the clear overarching principle in *Davis*: § 504 does not require massive expenditures. Plaintiffs, if they were to prevail, would compel the local defendants to expend huge resources over the next several decades which would fundamentally alter many transportation services. There is no escaping the fact that plaintiffs in this law suit seek a major overhauling of the transit system in their purpose to compel implementation of programs for the handicapped. However worthy their aims, § 504 does not permit this kind of massive relief.

Plaintiffs' comment that the *APTA* decision does not change the basic posture of this case because it only invalidates the regulations insofar as § 504 served as their statutory basis and because plaintiffs rely on other sources to establish liability, overlooks the import of the *APTA* decision. Regardless of what *APTA* has done to the regulations, it has clearly held that § 504 does not permit the kind of massive modifications that the regulations require and that plaintiffs seek to compel in this action. That plaintiffs may also base their claims

for relief on other statutes, regulations, and theories, does not alter the fact that § 504 cannot serve as a basis for the relief requested.

## 42 U.S.C. § 1983

The local defendants further contend that plaintiffs do not state a claim for relief under 42 U.S.C. § 1983. Last year, the Supreme Court explicitly held that § 1983 may be used as a vehicle to redress deprivation of rights secured by federal statutory as well as constitutional law.[63] Plaintiffs thus contend that, even if there is no private right of action under the various statutes here involved, § 1983 still authorizes this suit.

■ Although the holding in *Maine v. Thiboutot* is somewhat broad, its force is attenuated by two decisions of the Supreme Court this past Term. Those decisions, *Pennhurst State School and Hospital v. Halderman*[64] and *Middlesex County Sewerage Authority v. National Sea Clammers Association*,[65] establish two key exceptions to the *Thiboutot* rule. Thus, § 1983 is unavailable as a remedy for statutory violations if (1) Congress has foreclosed private enforcement of the statute in the enactment itself, for example by establishing comprehensive remedial devices within the substantive statute, or if (2) that statute does not create enforceable "rights." [66]

■ The Court holds that none of the statutes here relied upon by plaintiffs creates a substantive right sufficient to invoke § 1983 with the exception of § 504. As to § 504, however, the substantive right, as already noted, is limited in that affirmative efforts involving substantial and at times fiscally prohibitive sums are not required. Because § 1983 itself creates no substantive

---

**62.** *Id.* (Edwards, J., concurring), at 1281.

**63.** *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

**64.** —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

**65.** —— U.S. ——, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

**66.** It is noteworthy that Justice Brennan, the author of the *Thiboutot* opinion, joined the majority opinion in *National Sea Clammers*, which was written by Justice Powell, the author of the lengthy dissent in *Thiboutot*.

rights,[67] and it thus adds nothing of a substantive nature to the right created by § 504, it follows that § 1983 cannot alter plaintiffs' position insofar as § 504 is concerned.

There is no evidence that Congress, in passing the UMT Act, intended to create rights and obligations enforceable through § 1983. "Quite the contrary, the Act's language and structure demonstrate that it is a mere federal-state funding statute."[68] The purposes of the Act are, essentially, to "assist in the development of improved mass transportation facilities, equipment, techniques, and methods, . . . to encourage the planning and establishment of areawide urban mass transportation systems needed for economical and desirable urban development, . . . [and] to provide assistance to State and local governments and their instrumentalities in financing such systems."[69] The various sections of the Act, pursuant to these overall purposes, provide in detail for different grant programs[70] and long-range study.[71]

Section 16 of the Act was added in 1970 as a floor amendment; it did not appear in either the House or Senate committee reports. It was offered because of "the importance of establishing a national policy to aid these elderly and handicapped persons so that they might have the same equal right of access to public transportation facilities that other Americans have."[72] It was adopted with little discussion in the House and none in the Senate.[73] Indeed, it was presented in the Senate as part of an entire slate of amendments to the Act, most of which involved funding programs and none of which merited discussion.

■ Thus, to the extent that it is possible to fathom any congressional intent, Congress did not intend by § 16 to create a right enforceable by § 1983. In determining if the statute creates a right, the Court must be guided by the entire law and not just a single sentence.[74] The UMT Act is designed to "assist" and "encourage" states and localities to develop various mass transportation programs via federal grants. And § 16 itself, contrary to plaintiffs' view, does not unequivocally create a substantive right. Rather, it merely declares a "national policy" of equal access to mass transportation facilities for the elderly and handicapped and instructs that "special efforts" should be used to that end. Finally, it provides that all federal programs assisting in the area of mass transportation "should" implement this policy. Moreover, the section was meant to continue the existing general policy of removing barriers to the elderly and handicapped.[75] Thus, "nothing suggests that Congress intended the Act to be something other than a typical funding statute."[76]

The conclusion that § 16 of the Act does not create a substantive right enforceable through § 1983 finds support in the Supreme Court's recent decision in *Pennhurst.* There, the Court held, among other things, that § 6010 of the Developmentally Disabled Assistance and Bill of Rights Act of

**67.** *Maher v. Gagne,* 448 U.S. 122, 129 n.11, 100 S.Ct. 2570, 2574 n.11, 65 L.Ed.2d 653 (1980); *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1915, 60 L.Ed.2d 508 (1979).

**68.** *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981).

**69.** 49 U.S.C. § 1601(b)(1)–(3).

**70.** *Id.* §§ 1602, 1604.

**71.** *Id.* § 1607.

**72.** 116 Cong.Rec. 34180 (1970) (remarks of Rep. Biaggi).

**73.** *Id.* at 34181 (House), 34952 (Senate).

**74.** *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981); *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

**75.** 116 Cong.Rec. 34181 (1970) (remarks of Rep. Biaggi).

**76.** *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 1542, 67 L.Ed.2d 694 (1981).

1975,[77] the "bill of rights" of the mentally retarded, did not create substantive rights. The Court found that the statute was merely a funding statute whose purpose was to assist and encourage improving care and treatment of the mentally retarded by providing federal grants to support programs. It did not matter that § 6010 was couched in terms of "rights"—for example, that it states that "[p]ersons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities."[78] Indeed, as Justice Blackmun noted in his concurring opinion, this "bill of rights" could be viewed by some as "politically self-serving but essentially meaningless language."[79] In holding that the "bill of rights" does not create any substantive rights, the Court took special note that, unlike other provisions of the statute, § 6010 did not expressly condition receipt of funds on compliance; further, the legislative history demonstrated that § 6010 was a reaffirmation of existing rights, provides direction for improving the conditions of the mentally retarded, and establishes a clear federal policy on the rights of the mentally retarded. In the context of the entire statute, the Court found at most that § 6010 represented "general statements of federal policy, not newly created legal duties."[80] The same analysis pertains to § 16 of the UMT Act. It does not create a right enforceable through § 1983.

The same result obtains with respect to the remaining statutes relied upon by plaintiffs, and extended discussion is unnecessary. Section 165(b) of the Federal-Aid Highway Act of 1973[81] directs that the Secretary of Transportation shall require that programs receiving federal funding must be constructed to allow effective use by the elderly and handicapped. As with § 16 of the UMT Act, this provision is merely one part of a massive funding statute; it identifies an area in which policy dictates that federally funded construction should mandate various kinds of benefits for the elderly and handicapped. To reinforce this view, the legislative history indicates that Congress recognized that it was proper to use funds in the highway trust fund for mass transportation and it thus directed a federal-state evaluation of needs and capabilities of localities with respect to mass transportation.[82] The focus was not on creating rights in the elderly and handicapped. Finally, when Congress amended the section in 1974, it added a provision which is virtually identical to § 16 of the UMT Act, which, as noted previously, creates no substantive rights.[83] Thus, the Federal-Aid Highway Act does not create rights enforceable through § 1983.

Finally, the Department of Transportation and Related Agencies Appropriation Act of 1975[84] creates no rights. This is simply a prohibition directed at the Secretary of Transportation against the expenditure of certain funds for the purchase of mass transportation equipment for the fiscal year ending June 30, 1975 unless it is designed to meet the needs of the elderly and handicapped. This is nothing but a directive to the Secretary and it cannot seriously be contended that this was ever meant to create substantive rights.

■ Nor can plaintiffs seek redress of alleged violations of their right to equal protection of the laws under the Federal Constitution via § 1983, for no constitutional right is at stake in this action. No fundamental right is involved; wheelchair users are not a suspect class. Thus, the actions of local officials are constitutionally

---

**77.** 42 U.S.C. § 6010.

**78.** *Id.* § 6010(1).

**79.** *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 1547, 67 L.Ed.2d 694 (1981) (Blackmun, J., concurring).

**80.** *Id.* 100 S.Ct. at 1542.

**81.** Pub.L. No. 93–87, § 165(b), as amended by Pub.L. No. 93–643, § 105.

**82.** H.Rep. No. 93–118, *reprinted in* [1973] U.S. Code Cong. & Ad.News 1859, 1885–86.

**83.** Pub.L. No. 93–643, § 105(a).

**84.** Pub.L. No. 93–391, *reprinted in* [1974] U.S. Code Cong. & Ad.News 878, 888–89.

valid as long as there is a rational basis for the challenged actions and classifications.[85]

Plaintiffs contend that the local defendants purposefully and invidiously discriminated against wheelchair users. The allegations of the complaint do not sustain this charge. Paragraph 126 of the *Disabled in Action* complaint states in purely conclusory terms that the defendants have intentionally excluded wheelchair users from the transit system. However, plaintiffs do not allege any facts to show defendants' acts were motivated even in part by the desire to discriminate against wheelchair users. For example, plaintiffs allege that the local defendants ordered 837 inaccessible buses just months before the requirement to buy only accessible buses was to go into effect; there is no allegation that this purchase was motivated by a desire to restrict access by wheelchair users and not to reduce public expenditures by purchasing less expensive buses.[86] Similarly, allegations with respect to the failure to implement the paratransit program and the minibus project do not suggest that local officials had any improper motivations guiding their decisions. In the circumstances, plaintiffs' conclusory allegation that the local defendants have invidiously discriminated against them and their class cannot survive a motion to dismiss.[87]

There is a clear rational basis for the acts of the local defendants based upon the face of the complaints, and this is all the Constitution requires in this case. As has been noted elsewhere, the Constitution imposes no greater affirmative duty on states and localities than do the substantive statutes here at issue.[88] Thus, this branch of the complaints is dismissed.

*The Regulations*

█ The local defendants finally contend that plaintiffs do not state a claim for relief directly under the various regulations. This issue need not detain the Court long. Insofar as the regulations relied upon were promulgated pursuant to § 504, they cannot exceed the substantive scope of that statute, which, as noted earlier, does not require the kind of affirmative action sought in this action.[89] Indeed, the District of Columbia Court of Appeals struck down these regulations for just that reason.[90] Insofar as the regulations plaintiffs rely upon were promulgated pursuant to § 16 of the UMT Act and § 165(b) of the Federal-Aid Highway Act, as to which there is no private right of action, plaintiffs similarly have no right of action under the regulations, for the regulations cannot give to plaintiffs more than the statute allows.[91]

Accordingly, the complaints as to the local defendants are dismissed.

*Federal Defendants' Motion for Summary Judgment*

The thrust of plaintiffs' claims against the federal defendants is that the latter

**85.** E. g., *Frontiero v. Richardson*, 411 U.S. 677, 683, 93 S.Ct. 1764, 1768, 36 L.Ed.2d 583 (1973); *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

**86.** Conservation of public resources is a legitimate governmental interest. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Roundtree v. Berger*, 420 F.Supp. 282, 284–85 (E.D.N.Y.1976) (three-judge court), *aff'd mem*, 430 U.S. 912, 97 S.Ct. 1322, 51 L.Ed.2d 590 (1977).

**87.** *Koch v. Yunich*, 533 F.2d 80, 85 (2d Cir. 1976); *Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck*, 463 F.2d 620, 623 (2d Cir. 1972), *cert. denied*, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1972); *Morpurgo v.*

*Board of Higher Educ. in City of New York*, 423 F.Supp. 704 (S.D.N.Y.1976).

**88.** *See, e. g., Vanko v. Finley*, 440 F.Supp. 656, 663–64 (N.D.Ohio 1977); *Snowden v. Birmingham-Jefferson County Transit Auth.*, 407 F.Supp. 394 (N.D.Ala.1975), *aff'd mem*, 551 F.2d 862 (5th Cir. 1977).

**89.** *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

**90.** *American Public Transit Ass'n v. Lewis*, No. 80–1497, 655 F.2d 1272 (D.C.Cir. 1981).

**91.** *See, e. g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 n.18, 99 S.Ct. 2479, 2489 n.18, 61 L.Ed.2d 82 (1979).

have violated the various statutes and regulations and the Federal Constitution by continuing to approve grants to the local defendants despite the alleged failure to provide accessible transportation and by failing to sanction the local defendants for the alleged violation of the regulations. The federal defendants, in moving for summary judgment, contend that they have fully complied with all applicable statutory and regulatory requirements and that all decisions of the administrative agencies implementing the statutes and regulations were reasonably related to their objectives; that is, they were proper, rational, and not arbitrary or capricious but were in furtherance of the objectives of the statutes and regulations on which plaintiffs rely.

*Scope of Review*

Initially, the Court considers the appropriate standard of review. The federal defendants contend that their actions can be measured only by the "arbitrary and capricious" standard of the Administrative Procedure Act,[92] while the plaintiffs argue that the actions of the federal defendants are subject to *de novo* review by this Court upon a full trial on the merits. The plaintiffs contend that, upon such a full trial, this Court is empowered to review the entire process by which the local defendants developed their special-efforts plans and TIPs and by which the federal defendants considered and decided to approve the plans.[93] To accept plaintiffs' thesis would at once constitute this Court as an executive branch of government with the power to make policy decisions that are within the province of the executive under congressional mandate; moreover, it is contrary to the applicable statutory standard.

The appropriate standard of review in the context of informal administrative proceedings like those at issue here is set forth in 5 U.S.C. § 706(2)(A): "The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[94] Although the agency's actions are presumed to be regular, they are subject to "probing, in-depth review."[95] Thus, the Court considers only the administrative record upon which the agency acted; it must determine if the agency considered all the relevant factors under the statutes and regulations and whether there has been a clear error of judgment. In doing so, it may not substitute its judgment for that of the agency; rather, the Court simply inquires to see if the agency's decision is rational—the result of reasoned decisionmaking.[96] The inquiry is whether the Secretary followed the required procedures in discharging its functions. If the Court were to review the merits of the agency's conclusions, it would inappropriately involve itself in "complex technical considerations" which are the province of the administrative agency.[97]

In the informal administrative setting, however, what constitutes the administrative record to be reviewed may present a disputed issue of fact;[98] that is the case here. This is particularly important since "[r]eview must be based on the whole record even when the judgment is one of policy, except that findings of fact such as would be required in an adjudicatory proceeding or in a formal 'on the record' hear-

---

**92.** 5 U.S.C. § 706(2)(A).

**93.** Plaintiffs' Brief at 19.

**94.** *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

**95.** *Id.* at 415, 91 S.Ct. at 823.

**96.** *Id.; United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 526 (D.C.Cir. 1978); *Hooker Chemical & Plastics Corp. v. Train*, 537 F.2d 620, 630–31 (2d Cir. 1976);

*Schicke v. Romney*, 474 F.2d 309, 315 (2d Cir. 1973); *Delaware Citizens for Clean Air, Inc. v. Administrator of U.S. Envt'l Protection Agency*, 480 F.2d 972, 976 (3d Cir. 1973); *Hospital Ass'n of New York State, Inc. v. Toia*, 473 F.Supp. 917, 925 (S.D.N.Y.1979).

**97.** *Hospital Ass'n of New York State, Inc. v. Toia*, 473 F.Supp. 917, 925 n.13 (S.D.N.Y.1979).

**98.** *Id.* at 927.

ing for rulemaking need not be made." [99] Plaintiffs contend that the record before the Court is incomplete, and they request that the Court defer consideration of this motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and allow them to take discovery to complete the record. However, the Court holds that the administrative record now before the Court is that upon which the agency acted and is adequate to enable the Court to determine the path that the agency has followed in making its decisions and the basis on which those decisions were made. [100]

■ The federal defendants have submitted to the Court contemporaneous documents concerning the various actions which are the subject of plaintiff's attack. These documents and supporting memoranda, which are not affidavits prepared specifically for this litigation, are adequate to enable the Court to perform its limited function to determine if the agency took all relevant considerations into account, as will be discussed hereafter. Normally, if the proffered record is inadequate, the remedy is for the Court to require the agency, through affidavits or live testimony, to *explain* the record but not to augment it. [101] However, if there are contemporaneous records, as here, the validity of the actions of the agency will stand or fall on those. [102]

In pressing their contention that the administrative record is incomplete, however, plaintiffs rely heavily on an internal UMTA memorandum of one Ron Posthuma, which they claim supplies information that went into the final decisions but which was not reflected in the official statements included in the administrative record submitted to this Court. The Court does not agree with this contention. Administrative agencies, like other entities, have staffs which conduct research and analyze data with a view to guiding the ultimate decisionmakers in making policy judgments. Each of these employees has his own perspective and personal point of view. It is not unusual that lower echelon employees, each positive of the wisdom of his or her own opinion, make conflicting recommendations or reports to the higher authorities. However, the executive of the agency is the one charged with making decisions, and it is the final decision, and the facts and considerations directly relied upon by the ultimate decisionmaker in making that decision, that are the subject of review in the district court. Here, the federal defendants have provided this Court with contemporaneous records upon which the decisions were made. Only in rare situations, not present in this case, will the district court go into the "mental deliberations" of members of the agency. [103]

Thus, for the reasons that follow, the Court is satisfied that the documents offered by the federal defendants constitute the record upon which their actions were grounded and are sufficient to enable it to pass upon the validity of their actions. That review, as noted, is limited; because this Court "does not sit as a super-agency empowered to substitute its scientific expertise" for that of the agency, [104] it may

99. *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, 249 (2d Cir. 1977).

100. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978); *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *New York Shipping Ass'n v. Federal Maritime Comm'n*, 628 F.2d 253, 257–58 (D.C.Cir.1980); *National Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325 (2d Cir. 1977); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

101. *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 31 L.Ed.2d 106 (1973).

102. *Id.*

103. *United States v. Morgan*, 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941); *National Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 333 (2d Cir. 1977); *Hospital Ass'n of New York State, Inc. v. Toia*, 473 F.Supp. 917, 928 (S.D.N.Y.1979).

104. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1383 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978) (quoted in *Citizens for Balanced Environment & Transp v. Volpe*, 650 F.2d 455, at 460 (2d Cir. 1981).

not pass on the wisdom of the federal defendants' decisions, just the procedural sufficiency. The Court now turns to plaintiffs' contentions.[105]

*Special Efforts from 1970 to 1976*

■ At the outset, plaintiffs claim that the federal defendants continued to fund the mass transportation programs of the local defendants from 1970, when § 16 of the UMT Act[106] was passed, through 1976, when the first regulations became effective, though they knew or should have known that the local defendants had failed to make any "special efforts" as described in the statute. The federal defendants contend, however, that, in the absence of regulations, any special efforts during this period are of no more than historic interest.

The statutes upon which plaintiffs rely do not themselves contain any timetable for implementation of special efforts. Instead, they require a gradual effort toward achieving the statutory goals and not imme-

diate access.[107] The court in *Vanko v. Finley* noted that, while universal accessibility was the goal of § 16 of the UMT Act, "Congress was certainly cognizant of the technological and economic problems which immediate requirement of universal accessibility would create." [108]

UMTA during this period was researching and developing projects with a view to providing the elderly and handicapped with more access to transportation systems.[109] In the absence of any regulations during this time, and with the statutes themselves providing no explicit guidance on what action was required of both UMTA and local recipients of funding, it cannot be said that the federal defendants' actions during the 1970–76, pre-regulatory period were arbitrary or capricious.[110]

*Minibus Project*

The major special effort programmed for the fiscal year 1977–78 was the minibus

105. As already noted, *see* note 23 *supra,* the District of Columbia Court of Appeals has struck down the "504 regulations" insofar as they were promulgated pursuant to § 504 of the Rehabilitation Act of 1973 and remanded to the Secretary of Transportation to explicate if the regulations are in fact based as well on § 16 of the UMT Act and § 165(b) of the *Federal-Aid Highway Act* of 1973. *American Public Transit Ass'n v. Lewis,* —— F.2d ——, No. 80–1497 (D.C.Cir. May 26, 1981).
As the final draft of this opinion was being completed, the Department of Transportation on July 20, 1981 amended the "504 regulations" promulgated in 1979 to delete the portion relating to mass transportation, 49 C.F.R. Pt. 27, Subpt. E. DOT issued an interim final rule and requested comments by September 18, 1981. 46 Fed.Reg. 37488–94 (1981) The essential effect of the interim rule is to return the regulations to their original form as promulgated in 1976, *see* text accompanying notes 10–22 *supra.*
DOT acted both in response to the *APTA* decision and as part of the new Administration's ongoing review of the "504 regulations," which it considered among the most "costly and controversial" in existence. Under the interim rule, which is designed to provide local recipients of funds with some guidance pending the promulgation of final regulations, local recipients must certify to DOT that special efforts are being made in behalf of the handicapped. In this regard, the interim rule contains the various examples of what would constitute adequate special efforts that have been part of

the regulations since 1976; however, one alteration is that the example suggesting that expenditure of 5% of § 5 funds would constitute adequate special efforts has been amended to 3½%. *See* text accompanying notes 111 and 115 *infra.* The thrust of the interim rule is directed at a return to the less stringent requirements of the 1976 "special efforts" regulations, with a view ultimately to making certain programs for the handicapped matters of local option.
To the extent that this interim rule is based on the fundamental premise that the statutes relied upon by plaintiffs do not require the vast affirmative efforts of localities that the "504 regulations" mandated, this recent action of DOT strongly supports the analysis in this opinion.

106. 49 U.S.C. § 1612.

107. *Vanko v. Finley,* 440 F.Supp. 656, 660–661 & n. 3 (N.D.Ohio 1977).

108. *Id.*

109. *Snowden v. Birmingham-Jefferson County Transp. Auth.,* 407 F.Supp. 394, 396 (N.D.Ala. 1975), *aff'd mem.,* 551 F.2d 862 (5th Cir. 1977); 40 Fed.Reg. 8314, 8315 (1975).

110. *Cf. Lloyd v. Regional Transp. Auth.,* 548 F.2d 1277, 1287 (7th Cir. 1977) ("Without the benefit of any regulations, it is difficult to perceive what relief could have been afforded.")

project, which consisted of the purchase and implementation of one hundred minibuses equipped with wheelchair lifts to be operated on special, fixed routes chosen in consultation with the Task Force on Public Transportation for Elderly and Handicapped Persons and its advisory committee on the handicapped. The minibuses would be available to the general public as well as the handicapped.

Plaintiffs challenge the federal defendants' decision to approve this project as satisfying the special-efforts requirement for that fiscal year on the grounds that it would be inadequate, it was opposed by the handicapped community, the full capital cost was credited to special efforts although the minibuses would be fully available to the general public as well as the handicapped, and the TA did not meet the federal defendants' condition that it ensure priority for wheelchair users on the minibuses. As to the cost, the budget for the project was $5,000,000, of which the federal defendants' share was $4,000,000, which was over five percent of the total § 5[111] funds received by the local defendants that year. Plaintiffs contend, however, that five percent was the minimum permissible expenditure to qualify for special efforts, and if only the part of the minibus project which would inure to the special benefit of the handicapped were counted to the special-efforts requirement, the special efforts would have been well under five percent.

UMTA approved the minibus project as part of the 1977–78 fiscal year TIP, albeit with certain reservations.[112] Thus, UMTA expressed concern that the limited amount of service would be inadequate if demand was substantial, especially in light of the availability of the minibuses to the general public as well. To qualify as a special ef-fort, then, the TA would have to adopt controls to ensure priority to wheelchair users and guarantee availability of space (perhaps by interspersing nonaccessible buses on the routes to provide for the general public). UMTA recognized that, normally, only the cost of wheelchair lifts may count toward special efforts with respect to fixed-route buses, but in this instance it counted the full cost of the buses thereto with the understanding that the buses would run on special routes to meet the needs of wheelchair users and which would be designed in consultation with them. Moreover, it understood that the TA would monitor the system to ensure proper use. UMTA expressly warned that future operating costs would be prorated and only that portion corresponding to the use of the handicapped would count toward the special-efforts requirement.[113]

In later approving the formal grant application of the local defendants for the minibus project, UMTA noted that the Task Force had developed a plan for increased accessibility. Under this plan there would be "surveying of existing services in the City, identification of target populations, establishment of priorities and identification of transportation projects which could be undertaken." Moreover, UMTA recognized that the minibus project was necessarily only a beginning and could not by itself provide accessible transportation for all potential users; thus, it noted with approval the continuing study of para-transit services which would provide door-to-door service.[114]

The record reveals UMTA's decisions on the minibus project and the reasons therefor. It is clear that UMTA understood the nature of the project and its potential limitations; thus, it required of the local de-

---

111. 49 U.S.C. § 1604.

112. Approval of the annual element of a TIP by UMTA "reflects the decision by UMTA that the planning requirements of the UMT Act are satisfied"; it does not, however, reflect a "decision on the merits of the individual project or the availability of the federal funds to support the project." The latter must await formal submission of individual project applications.

Affidavit No. 1 of Hiram Walker, Regional Administrator of UMTA, at ¶ 9 [hereinafter "Walker aff. no. 1"].

113. UMTA Memorandum on Special Efforts, exh. 2 to Walker aff. no. 1.

114. UMTA Approval Memorandum for Minibus Grant Application, exh. 5 to Walker aff. no. 1.

fendants that they take steps to ensure that the service would in actuality provide the promised service to the handicapped. The full cost of the project was credited to special efforts although the system had fixed routes because the routes were to be designed to meet the special needs of the handicapped.

The regulations do not require that a recipient of funding spend at least five percent of its § 5 funds on projects for the handicapped and elderly to satisfy the special-efforts requirement; therefore, even if plaintiffs are correct that UMTA improperly credited the full cost of the project to special efforts and that the cost of the wheelchair lifts alone would not have met the five percent minimum, there would still be no basis for upsetting the finding that the special-efforts requirement was met by the local defendants. The provision of the regulations on which plaintiffs rely to support an absolute five percent minimum is very clear that it is an "example[ ] of a level of effort that will satisfy the 'special efforts' requirement. [The examples] *are not regulatory standards or minimums, neither do they exhaust all valid approaches. They are meant to guide the development of local public transportation opportunities for wheelchair users . . . that in fact meet a significant fraction of the identified need within a reasonable time.*" [115]

■ In sum, the record demonstrates that the decisions of the federal defendants with respect to this matter showed concerned interest and understanding of the problems. They approved the minibus project although they had reservations because they understood that it was an important and significant first step in the local defendants' efforts to provide accessible

transportation for the handicapped. The regulations do not require immediate accessibility, nor do they provide rigid requirements on the substance of various projects that are designed to meet the special-efforts requirement. The federal defendants' actions in approving the minibus project cannot be said to be arbitrary or capricious or without basis in law.

Indeed, plaintiffs' complaint about the approval of the minibus project is to a large extent beside the point. That project was abandoned when the only bid received was seventy-five percent above the budgeted amount and it was determined that a re-bid would be fruitless. Thus, in 1980 UMTA approved the local defendants' request to switch the special-efforts funds allotted to the minibus project to the purchase of two hundred wheelchair lifts on the new Grumman Flxible buses and also the purchase of seven new accessible buses.[116] This switch in the use of funds was deemed by UMTA to satisfy the special-efforts requirement for 1977–78, the fiscal year in which the minibus project was approved.

Thus, even if the minibus project were fundamentally flawed and improperly approved over the opposition of the handicapped community, it was abandoned for the legitimate reason that the only bid received on the project was wholly in excess of the approved budget. Plaintiffs' suggestion that the delay between the project's approval and abandonment is attributable to UMTA's failure to provide oversight cannot be supported in light of the reason for abandoning the project; surely, UMTA cannot be held responsible for the failure of local defendants to receive a bid within the project's budget.[117]

---

**115.** 49 C.F.R. Pt. 613 App. (emphasis supplied).

**116.** This switch was endorsed, as far as the 200 wheelchair lifts were concerned, by a representative of the handicapped community at a public hearing on the issue. *See* Transcript of Public Hearing of Feb. 4, 1980 at 16 (remarks of James J. Weisman), exh. 3 to Walker aff. no. 2. The representative noted opposition to crediting the full cost of the seven buses to special efforts and also to the possibility of counting

the 207 buses to fiscal year 1979–80 special efforts.

**117.** In concurring with the local defendants' dissatisfaction with the size of the only bid received, UMTA noted that "the reliability and longevity of a small diesel transit bus [the minibus] has not been proven to the extent where a per unit cost of $87,550 is justified. The shortcomings of the small diesel transit bus are magnified by the poor physical conditions of New York City streets." UMTA Memorandum

The decision to accept the new use of the minibus funds was entirely rational and not arbitrary or capricious. It was based on the unfortunate reality that the previously programmed project was no longer feasible. Finally, plaintiffs' lament that funds budgeted in the 1977–78 fiscal year will not have been spent before fiscal year 1981–82, while understandable, is not actionable. There is no requirement that special efforts provide immediate results, and in any event the federal defendants cannot be held responsible for events beyond their reasonable control.

*Paratransit Services*

The paratransit system was first approved as a special effort in the TIP for the 1978–79 fiscal year and also represented the major special effort for the following two fiscal years. Plaintiffs attack the system on several grounds, many of which go directly to its merits. For example, they charge that UMTA approved the plan though it was based on faulty data with respect to the eligible population, probable demand, and feasible productivity. Moreover, they contend that, at the time UMTA approved the plan based on a proposal for sixty-four vehicles, the TA had in fact already reduced the scope of the plan to include only forty vehicles. Finally, plaintiffs claim that there has been a total failure to comply with the conditions set by UMTA in its initial approval of the paratransit system as a special effort, yet the federal defendants have continued to fund local mass transportation projects and have not in any way sanctioned the local defendants.

Before considering the paratransit program and the 1978–79 TIP in which it was first contained, UMTA served notice on the City that it did not consider the City to be complying with the special-efforts requirement, and it requested a proposal that

would meet the requirement. The City responded with a special directive from Mayor Koch to NYCDOT directing the latter "to proceed immediately to develop a plan for a City-wide paratransit system which will provide door-to-door transportation for qualified wheelchair-bound and other semi-ambulatory persons." The directive required a complete report within twelve months (*i. e.*, by November 1979), and implementation commencing on an incremental basis by January 1980.[118] In addition, the City informed UMTA about its plans for the paratransit system in a letter from Deputy Mayor Menschel. The City was completing the system design and service characteristics, would identify funding sources and prospective clientele, and develop documents for the purchase of transport services. The letter reiterated the City's commitment to the paratransit program and noted, as will be discussed hereafter, that "New York City presents the most difficult framework, principally because of the scale involved, in which to work."[119]

Thus, despite the previously expressed reservations, UMTA approved the 1978–79 TIP, which consisted essentially of the paratransit program, as a satisfactory special effort, largely on the basis of the Koch directive and other communications from the City. The approval, however, was subject to four conditions. First, an implementation schedule was to be submitted to UMTA by February 1, 1979; second, the City was to adhere strictly to the schedule; third, there were to be monthly sessions between the City and UMTA to review progress; fourth, initial implementation of service was to be by January 1, 1980. UMTA recognized the importance of the paratransit program as "[t]he effort that ties the entire NYC special efforts together."[120]

on Application to Switch Minibus Funds, exh. 9 to Walker aff. no. 1.

**118.** Exh. 12 to Walker aff. no. 1.

**119.** Letter from Menschel to Walker, Nov. 2, 1978, exh. 11 to Walker aff. no. 1.

**120.** UMTA Memorandum from Walker to Associate Administrator for Transportation Planning, Nov. 24, 1978, exh. 13 to Walker aff. no. 1.

The memorandum of the regional administrator recommending approval of the paratransit program was based in part on the report of a consultant to the City.[121] In that report the consultant outlined several general considerations which it believed should serve as a guide in developing a paratransit system. For example, and significantly, the consultant, noting the difficulties of quantifying the actual trip demand of the target population, said that the demand for an effective door-to-door transport system can be expected to develop slowly and that the ultimate demand for the system would be a function of several factors, including aggressiveness in marketing and removal of nontransport barriers to improved mobility. The consultant thus commented, "with a pragmatic consideration for the City's financial difficulties, any new transport system that is developed for the City's wheelchair-bound population should begin modestly and should only be expanded as the demand for the services offered truly develops. Nothing could be worse than to have excess special transport capacity sitting idle and costing the City monies that are desperately needed to help meet the operating deficits of the regular transportation system."[122] Thus, the consultant proposed a system that was "flexible and dynamic in nature" and "as cost effective as possible given the 'high cost' nature of the services provided."[123] Further, the consultant noted that, at a $5,000,-000 annual funding level, its proposed system would deliver about ten percent of the potential trip demand, an amount that it estimated would be close to the actual initial demand for the service.[124]

As noted earlier, plaintiffs' allegations with respect to the paratransit system are of several different types. The first is readily disposed of. Plaintiffs challenge, essentially, the wisdom of implementing the project as proposed; they argue that the system was based on incorrect data and would ultimately serve a very small percentage of the handicapped population. However, plaintiffs may not here challenge the merits of the program; rather, the standard of review is whether the federal defendants were arbitrary or capricious in approving the project. By this standard, federal defendants' treatment of the intrinsic merit of the paratransit system easily passes muster.

With respect to plaintiffs' charges that the actual target population of wheelchair users is much higher than the 117,000 on which the local defendants based their estimates, that trip demand would be higher than predicted, and that the expected productivity for the New York system was far greater than that achieved anywhere else, the short answer is that the system in its initial implementation stage was in effect to start slowly and expand as the need developed. Thus, even taking the figures offered by plaintiffs' experts as accurate,[125] UMTA's approval was reasonable. There is no requirement that the system be immediately accessible to all potential users; indeed, UMTA properly considered many factors, including the practicalities of implementation, and decided the proposed system qualified as a valid special effort.[126]

Plaintiffs further challenge that the federal defendants' actions regarding the paratransit program were deficient in that they

121. Exh. 1 to Walker aff. no. 2.

122. *Id.* at 2–3.

123. *Id.* at 4–5.

124. *Id.* at 9.

125. The federal defendants contend that the Court should not consider the expert affidavits inasmuch as they were never offered to UMTA during the administrative deliberations. The Court does not pass on this contention, however, since, even accepting the experts' figures,

UMTA's approval of the system was not arbitrary or capricious.

126. The regulations provide that a paratransit system is accessible if it "operate[s] a number of vehicles sufficient to provide *generally equal service* to handicapped persons who need such vehicles as is provided to other persons." 49 C.F.R. § 27.91(a) (emphasis supplied). UMTA's approval of a system which would slowly grow to meet demonstrated need cannot be said to be arbitrary or capricious when measured against this standard.

failed to ensure that the local defendants would comply with the four conditions imposed when the 1978–79 TIP was approved. In particular, plaintiffs urge that the implementation schedule submitted to UMTA in February 1979 was fatally defective in that it failed to provide for prompt initiation of 13(c) negotiations with local labor unions.[127] Plaintiffs contend, again in expert affidavits, that experience elsewhere demonstrates that UMTA should have known that early initiation of such negotiations was crucial and it was thus unreasonable for UMTA to have approved a schedule without provision therefor.

The record refutes plaintiffs' claims. Although it is true that the schedule did not contain a starting date for 13(c) negotiations, the record indicates that the UMTA staff advised NYCDOT of the advisability of prompt initiation at the onset of the project and, upon the recommendation of the UMTA staff, NYCDOT prepared a preliminary grant application with a description of the project which it sent to both UMTA and the United States Department of Labor in March 1979.[128] Thus, in actuality efforts were commenced at an early stage; however, long delays ensued. At a late stage, UMTA formally sought to have the Department of Labor expedite matters.[129]

Especially in light of the early initiation of 13(c) negotiations, it borders on the absurd to hold UMTA responsible for the failure of the local defendants and the labor unions to reach an agreement. As everyday events indicate, resolution of labor disputes is far from predictable. In rejecting the union's proposed agreement, NYCDOT stated that the union misconceived the characteristics of the proposed paratransit system; since it was limited in nature, the system would not compete with the regular

transit system and would not adversely affect mass transit employees. Further, it was possible that the system would be only temporary, until full accessibility in the whole system was achieved. "Consequently, we view as inappropriate any 13(c) agreement which seriously limits the City's flexibility in downgrading or eliminating our paratransit service, or which places severe financial penalties on exercising either of these two options."[130] It is apparent that the interests of the union did not coincide with those of the local defendants, and the federal defendants cannot be held accountable for the failure to gain an agreement on schedule. Indeed, these negotiations were further delayed because the issue was sidetracked when the unions prepared for negotiations on their own basic collective bargaining agreement covering the entire transit system; thus, these 13(c) negotiations were a subordinate matter in the minds of the union officials as against the broader issues involving the entire transit system.[131]

Plaintiffs further contend that the federal defendants approved the TIPS for 1979–80 and 1980–81 although no new projects beyond the paratransit program were included and though no tangible progress was made on the paratransit program. As for the 1979–80 TIP, UMTA noted that there had been two delays, the 13(c) problem noted above and a disagreement between the MTA and NYCDOT over the source of certain funding. However, UMTA noted that, once the certification of the Department of Labor on the 13(c) negotiations was obtained, implementation of the project would be feasible. Thus, it found that, "[a]lthough the delays in initiating service are becoming critical, the causes of the delay have been

**127.** These are negotiations required by 49 U.S.C. § 1609(c) with respect to protecting employees affected by any programs approved through the UMT Act.

**128.** Letter from Commissioner Ameruso of NYCDOT to Walker, Sept. 8, 1980, exh. 24 to Walker aff. no. 1.

**129.** Letter from UMTA to Department of Labor, March 7, 1980, exh. 20 to Walker aff. no. 1.

**130.** Letter from NYCDOT to Union, Dec. 20, 1979, exh. 18 to Walker aff. no. 1.

**131.** *See* letter from NYCDOT to UMTA, Jan. 17, 1980, exh. 19 to Walker aff. no. 1.

beyond NYCDOT's control." [132] The same rationale for approving the 1980–81 TIP was given.[133] Plaintiffs contend that these TIPs were defective in that no new projects were included; however, the regulations do not require that new projects be proposed each year.[134]

In sum, the actions taken by the federal defendants with respect to the paratransit program since 1978 are not arbitrary or capricious or otherwise not in accordance with law.

Other Complaints

■ Plaintiffs charge that the local defendants ordered an unprecedented 837 new inaccessible buses in March 1979, a number far in excess of their average annual order of new buses. They allege that this large order was made in order to avoid the accessibility requirements of the then-pending new regulations, which were to take effect on July 2, 1979. They further allege that the federal defendants approved this large purchase although UMTA "intend[ed] to limit its consideration of bus grants to those that provide for accessible buses."[135]

The federal defendants' approval was not arbitrary or capricious. The regulations themselves merely require that new buses "for which solicitations are issued after [July 2, 1979] shall be accessible to handicapped persons, including wheelchair users."[136] Thus, the local and federal defendants were free to purchase usual type buses in March 1979, before the effective date of the regulations, July 2, 1979, and there is no basis for the claim that, in so acting within their authority, they were motivated by a purpose to limit funds for accessible buses after July 2, 1979. Moreover, the grants for the 837 buses in question had been approved in September 1977,[137] almost two years before the effective date of the regulations.

■ Plaintiffs claim that, on many occasions, federal defendants approved projects although the local defendants had failed to comply with the general regulatory mandate to consult with members of the handicapped community in designing programs.[138] Further, they complain that, on occasions when there was consultation, the advice of the handicapped often was not followed. However, in addition to there being no requirement that any advice given be followed, any failure by the local defendants to consult as required under the regulations is not properly chargeable to the federal defendants. To hold the federal defendants responsible would fundamentally alter their role in the mass transportation funding process.[139]

Finally, plaintiffs press their claims under § 315 of the Department of Transportation and Related Agencies Appropriation Act of 1975 and under the Federal Constitution against the federal defendants as well as against the local defendants. For the same reasons that these claims failed

132. UMTA Memorandum on Approval of 1979–80 TIP, exh. 22 to Walker aff. no. 1.

133. UMTA Memorandum on Approval of 1980–81 TIP, exh. 23 to Walker aff. no. 1.

134. 49 C.F.R. § 27.97(a) ("the annual element of [the TIP] ... shall exhibit a reasonable level of effort in programming projects or project elements.... Reasonable progress in implementing previously programmed projects ... shall be demonstrated.")

135. 44 Fed.Reg. 31455 (1979) (preamble to 1979 regulations).

136. 49 C.F.R. § 27.85(b).

137. Walker aff. no. 1, ¶ 18.

138. *See* 49 C.F.R. § 27.107(b).

139. *Cf. Hospital Ass'n of New York State, Inc. v. Toia,* 473 F.Supp. 917, 940 (S.D.N.Y.1979) ("[T]he State's failure to comply with the applicable State statute and federal regulation [does not] warrant[ ] reversal of HEW's approval .... The duty to consult ... is one that runs directly against the State, ... and to overturn HEW's decision on account of the State's dereliction of duty would have the effect of imposing on HEW—in its review and approval role— all the substantive obligations that are, by statute and regulation, properly the State's. Such an imposition would improperly amend the HEW's status from editor to author of the plan.... [T]hough the State's failure to [consult] ... is deplorable, if not explicitly illegal, the appropriate remedy is ... not the undoing of HEW's approval.")

against the local defendants,[140] they fail against the federal defendants as well.

## Summary

The path that the federal defendants have followed in reviewing the programs of the local defendants and approving projects and grants is clear: they acted within their authority and in consideration of the proper factors. Thus, it cannot be said that their actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Indeed, this case, which presents troubling and important problems of how best to effectuate the salutary national policy of facilitating the mobility of those confined to wheelchairs and other handicapped individuals, is a prime example of the propriety of entrusting implementation of such a policy to administrative agencies expert in the field and, correspondingly, of limiting the role of the judiciary. Courts are not "super-agencies" with the power or expertise to exercise their own scientific judgment;[141] neither are they necessarily qualified to interject themselves in the midst of competing policy considerations to ferret out the "best" ultimate policy. Thus, the standard of review in this kind of case is properly limited to ensuring that the administrative agency has complied with all the procedural requirements the statutes and regulations impose.

The competing policy and technical factors presented in this case are staggering. Mention has already been made of plaintiffs' experts' contentions that the local defendants' assumptions on the paratransit program were fundamentally flawed; the record indicates that the local defendants' consultant would disagree. It is properly the role of the administrative agency to assess the route to take, not the court. Further, as noted above, the 13(c) negotiations have been stymied in large measure because the local unions' concept of their responsibility to their membership differed from that of the local defendants. The resolution of their differences is not within the competence of the federal defendants nor are they charged with responsibility in this area. The Department of Labor, expert in labor matters, is charged with this responsibility and is in a much better position than a court to try to achieve beneficial results with respect to a 13(c) settlement.

Moreover, perhaps the single overriding factor here that counsels against a court assuming an active role is the very practical nature of the problems presented. These problems do not lend themselves to rigid application of general rules. The agency must consider not only the needs of the general population but also the conflicting interests of different groups within the handicapped community. For example, some individuals prefer escalators, other elevators; blind persons want gates on subways. The handicapped community includes, besides those in wheelchairs, the deaf, blind, and mentally retarded.[142] A court, besides not being equipped with the expertise of an agency to oversee such affairs, cannot properly consider all these competing concerns when only the class of wheelchair users is before the Court.

It is understandable that those for whom programs are intended become impatient when they are not implemented with dispatch and when their hopes are not immediately realized. Plaintiffs, for example, complain that, despite all the programming for the past several years, all the promised accessible buses are not actually on the streets. But judicial notice can be taken of the mass breakdowns of the new Grumman Flxible buses in New York City and elsewhere. How can the defendants here fairly be charged with the consequences of these failures as they apply to the handicapped? Indeed, the failures of these buses have

---

140. *See* text accompanying notes 84–87 *supra.*

141. *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1383 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

142. *See* Transcript of Hearing, Feb. 4, 1980, exh. 3 to Walker aff. no. 2.

deprived the general population as well as the handicapped of needed mass transportation equipment.

Beyond these considerations, it is abundantly clear that technical and policy judgments must be made at every stage in the process from planning through implementing programs. In this regard, a letter from the Chairman of the MTA to the Secretary of Transportation, while certainly not unbiased, accurately presents these practical considerations which counsel against a court's involvement in substituting its judgment and second-guessing agency determinations.[143] The Chairman, speaking for the Board of the MTA, was of the view that "any plan complying strictly with the regulations would prove unrealistic and unworkable: unsafe, prohibitively expensive, inefficient, indeed non-functioning." Referring to studies made of New York's aging transit system, the Chairman suggested several specific difficulties with strict compliance with the regulations. For example, fully accessible subways within the definition of the regulations might reduce the total number of trains during rush hour by as much as thirty percent, which in turn would exacerbate already dangerously overcrowded conditions on platforms; emergency evacuation procedures for wheelchair users would be necessary; and increased idling time of buses while wheelchair users boarded would further slow bus service and perhaps contribute to the growing frustration of the general public with the quality of service provided by the MTA. Thus, the needs of the community at large must also be considered.

These considerations do not suggest that the regulations should be abandoned or that the goal of providing transportation to the handicapped is inherently unworkable. Instead, they indicate that the scope of the problem is extraordinarily complex and is properly attacked by those directly charged with responsibility and expertise: the local and federal defendants. Their efforts in this regard of necessity must be dynamic; that is, because of the nature of the problem, they must be free to confront unforeseen problems as they arise without the threat of active judicial intervention at every turn. Thus, the role of the court in this situation is properly limited to ensuring that the agency has fairly discharged its functions and that its decision is neither arbitrary nor capricious. The federal defendants in this case have satisfied that standard.

### Conclusion

In sum, plaintiffs do not have a private right of action against the local defendants under § 16 of the UMT Act or § 165(b) of the Federal-Aid Highway Act; § 504 of the Rehabilitation Act does not warrant the kind of relief requested by plaintiffs; and no relief is available to plaintiffs under 42 U.S.C. § 1983. Accordingly, the local defendants' motion to dismiss the complaints is granted. Further, the decisions and actions of the federal defendants were not arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, the federal defendants' motion for summary judgment is granted.

So ordered.

---

143. *See* Letter from Ravitch to Goldschmidt, Sept. 26, 1980, exh. 25 to Walker aff. no. 1.