**George LLOYD, et al., Plaintiffs,**

v.

**ILLINOIS REGIONAL TRANSPORTATION AUTHORITY, et al., Defendants.**

**No. 75 C 1834.**

United States District Court, N. D. Illinois, E. D.

Sept. 30, 1982.

Dodge Wells, Wallace C. Winter, Susannah Smith, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

James C. Munson, Lawrence E. Strickling, David M. Harris, Kirkland & Ellis, Chicago, Ill., for Regional Transp. Authority, Lewis Hill.

Paul Blankenstein, Robert D. Nesler, Dept. of Justice-Civil Division, Washington, D.C., Gail Ginsburg, Ass't U.S. Atty., Chicago, Ill., for Andrew L. Lewis, Sec'y of Transp., Arthur E. Telle, Jr., Administrator of Urban Mass Transportation Administration, Raymond S. Barnhart, Administrator of Federal Highway Administration U.S. Dept. of Transp.

Norman J. Barry, Joseph P. Della Maria, Jr., Daniel Cummings, Rothschild, Barry & Myers, Chicago, Ill., for Chicago Transit Authority, Eugene Barnes.

Tyrone C. Fahner, Atty. Gen. of Ill., Judith Mostovoy, Gary Medler, Ass't Attys. Gen., Chicago, Ill., for Chicago Area Transp. Study, John Kramer.

Ronald Bartkowicz, Chicago Transit Authority, Chicago, Ill., for Chicago Transit Authority.

Richard J. Bacigalupo, Urban Mass Transp. Admin., Washington, D.C., for Urban Mass Transp. Authority.

## MEMORANDUM OPINION

KOCORAS, District Judge:

Plaintiffs bring this action on behalf of a class of mobility-handicapped individuals who challenge the efforts of local, state, and federal officials and agencies to comply with various statutes and regulations securing the rights of the handicapped to use and to have access to the mass transportation system in the Chicago metropolitan area. Plaintiffs' Third Amended Complaint, which is at issue here, seeks declaratory and injunctive relief for alleged violations of the Urban Mass Transportation Act, 49 U.S.C. §§ 1601 et seq., § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, § 165 of the Federal-Aid Highway Act of 1973, 23 U.S.C. § 142, the applicable federal regulations promulgated under the authority of the foregoing statutes, and the Civil Rights Act of 1871, 42 U.S.C. § 1983. The defendants have filed motions to dismiss and for summary judgment.

The named plaintiffs are George A. Lloyd, who is a quadriplegic confined to a wheelchair since 1953, Janet B. Wolfe, who is mobility-disabled because of a chronic pulmonary dysfunction, and Harold Brennan, who is also disabled because of partial paralysis in both legs from polio. All are residents of Chicago, but they sue on behalf of all mobility-disabled persons residing in the region served by the local defendants.

The defendants may be characterized as federal and local. The federal officials and agencies sued in this action include the former Secretary of Transportation, the United States Department of Transportation (DOT), the former administrator of the Urban Mass Transportation Administration (UMTA), and the former administrator of the Federal Highway Administration (FHWA). These will hereafter be referred to as the "federal defendants". Pursuant to Fed.R.Civ.P. 25(d)(1), the present administrators of the UMTA, FHWA, and the DOT are substituted as party defendants.

The local defendants include the Regional Transportation Authority (RTA), which provides public transportation and assists in the public mass transportation system in this region, the Chicago Transportation Authority (CTA), which administers and provides mass transportation service in the Chicago metropolitan area, the Chicago Urban Transportation District (CUDT), the administrators of the foregoing entities, and the Chicago Area Transportation Study (CATS), which is the Metropolitan Planning Organization (MPO) for the transportation area served by the RTA, CTA and the CUTD. Both the CTA and the RTA are municipal corporations established pursuant to Ill.Rev.Stat.1975, ch. 111⅔, §§ 701.01 et seq. and 301 et seq.

The local defendants receive direct or indirect federal financial assistance under the auspices and approval of the federal defendants. Count I of the Third Amended Complaint alleges that the local agency defendants have violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, because they have conducted the mass transit operations in such a way as to exclude plaintiffs and their class from use of the system by reason of plaintiffs' handicaps. Count II alleges that the local agency defendants' conduct in excluding plaintiffs from the mass transit system has violated Section 504 of the Rehabilitation Act, the regulations promulgated thereto, and 42 U.S.C. § 1983. Count III alleges that the local agency defendants have failed to take "special efforts" to plan and to design the mass transit system so as to assure the meaningful usage of the federally-financed facilities by the elderly and handicapped; the third count asserts violations of section 16(a) of the Urban Mass Transportation Act, 49 U.S.C. § 1612(a), the Federal-Aid Highway Act, 23 U.S.C. § 142, and 42 U.S.C. § 1983. Count IV, which is the only count against the federal defendants, alleges that they violated section 16(a) of the UMTA, 49 U.S.C. § 1612(a), the Federal-Aid Highway Act, 23 U.S.C. § 142, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the federal regulations implementing those pro-

visions by approving the local defendants' applications for federal financial grants with the knowledge that the mass transit system had been and would continue to be inaccessible to the elderly and handicapped.

The plaintiffs seek both declaratory and injunctive relief. In particular, plaintiffs seek a declaratory judgment that they have a right of meaningful access to the mass transit system; that the defendants have violated the plaintiffs' rights secured by the UMT Act, the FAHA, the Rehabilitation Act, 42 U.S.C. § 1983, and the applicable federal regulations; and that the local defendants have violated the regulations codified in 49 C.F.R. Parts 609 and 613. The prayer for relief also seeks an injunction against the local defendants from operating or owning any vehicles or facilities "in addition to those currently owned or operated", which are not designed for use and accessibility by the mobility-handicapped, until (a) the local agency defendants have completely implemented all projects contained in the 1976, 1977, 1978 and 1979 Annual Elements; (b) the local agency defendants have made all buses, rapid transit facilities, and fixed facilities constructed or purchased since May 1, 1976 accessible to the handicapped; and (c) the local defendants can satisfy this court that adequate plans have been made to design and to construct services and facilities that can be used by the handicapped. (Third Amend. Complaint, Prayer for Relief, ¶ 5). Plaintiffs seek to enjoin the federal defendants from releasing any funds to the local defendants or from approving any projects and proposals until the local defendants have complied with the foregoing requirements in paragraph 5 of the prayer for relief. (Third Amend. Complaint, Prayer for Relief, ¶ 6).

The same statutes and applicable regulations were involved in a recent case brought on similar grounds before Judge Weinfeld in the United States District Court for the Southern District of New York. *See, e.g., Dopico v. Goldschmidt,* 518 F.Supp. 1161 (S.D.N.Y.1981), *aff'd in part, rev'd in part,* 687 F.2d 644 (2nd Cir. 1982).[1] Judge Weinfeld's lengthy opinion adequately described the statutes involved and the regulations implementing them. *Id.* at 1166–1169. In addition, the Memorandum in Support of the Federal Defendants' Motion to Dismiss Third Amended Complaint or, Alternatively, for Summary Judgment, provides a very thorough and able review of the applicable federal statutory and regulatory provisions. (Federal Defs. Memo. in Support at 7–16). This court need not dwell on the regulations that have already been fully described in Judge Weinfeld's decision in *Dopico* and by the brief of the federal defendants. A broad overview of the applicable regulations, however, is necessary for purposes of the motions before the court.

The first regulations implementing section 16(a), section 165(b), and section 504 were promulgated in 1976 in order to provide for accessible mass transportation for handicapped persons ("the 1976 regulations"). *See* 23 C.F.R. Part 450. They required the creation of a Metropolitan Planning Organization ("MPO"), which in this case is the defendant Chicago Area Transportation Study (CATS). The MPO is responsible "for carrying out the urban transportation planning process . . . and shall develop the planning work programs [TIP] . . . [and] shall be the forum for cooperative decision making by principal elected officials." 23 C.F.R. § 450.112(a). The TIP is a "staged multiyear program of transportation improvements including an annual element." *Id.* § 450.304. The purpose of the TIP is to identify transportation improvements for a particular program period, indicate priorities, and estimate costs; the an-

1. After this opinion was drafted, but before it was issued, the Second Circuit Court of Appeals affirmed Judge Weinfeld's conclusions that there was no private right of action implied under section 16 of the UMT Act or section 165(b) of the FAH Act. Further, the Court of Appeals agreed that plaintiffs had failed to state an equal protection claim under § 1983.

The court held, however, that plaintiffs had stated a claim for relief under § 504 of the Rehabilitation Act and that the federal agencies defendants' motion for summary judgment should be denied. In those two respects, Judge Weinfeld's decision was reversed. The Second Circuit's ruling basically comports with the decision here.

nual element of the TIP sets forth the projects being funded for that fiscal year. *Id.* §§ 450.308 and 450.310–312; *Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1167.

The UMTA must determine that a program conforms to the regulations in order to certify it for federal funding. *Id.* § 450.320. Significantly, the 1976 regulations also required that the TIP must include "special efforts" in planning public mass-transit facilities so that they can effectively be used by the elderly and the handicapped. *Id.* § 450.120(a)(5). Thus, the locality must demonstrate genuine, good-faith progress in planning services for disabled persons and "reasonable progress" in implementing previously approved projects. 23 C.F.R. Pt. 450, Sub. A, App. B; 49 C.F.R. § 613.202(c).

An Appendix, which supplements these regulatory requirements, sets forth specific examples of effort that will be deemed to satisfy the "special efforts" requirement. 41 Fed. Reg. 18234. The three examples described in the Appendix include:

A program for wheelchair users and semi-ambulatory persons involving annual average expenditures equivalent to a minimum of 5 percent of the urban area's apportionment under section 5 of the UMT Act.

Purchase of only wheelchair-accessible, fixed route vehicles until one-half of the fleet is accessible or development of a substitute service that will provide comparable coverage and service.

Any type of system that assures every wheelchair user or semi-ambulatory person transportation of 10 round trips per week within the service area, at prices comparable to those charged for the standard service for trips of similar length.

The Department of Transportation issued a second set of regulations in 1979 in order to implement an executive order and new guidelines on the subject of accessibility for handicapped persons. 44 Fed. Reg. 31442 *et seq.* adding 49 C.F.R. Part 27 (1979 regulations). The HEW guidelines mandated "program accessibility" or "mainstreaming" for the mobility handicapped; "main-

streaming" was defined as "the concept of prohibiting the exclusion of handicapped persons from programs by virtue of architectural barriers to such facilities as buildings, vehicles and walks . . ." 43 Fed. Reg. 2132, 2135 (1978), 45 C.F.R. §§ 85.1 et seq. (1980). The 1979 "mainstreaming" regulations superseded the 1976 "special efforts" regulations. *Id.* As a result of the new regulations, each mode of public transportation must be accessible to the handicapped, and recipients of federal grants who did not plan to achieve program accessibility by July 2, 1982 were required to provide interim accessible transportation until the full accessibility was achieved. 49 C.F.R. § 27.-97.

The 1979 regulations had been enacted to implement section 504 of the Rehabilitation Act, section 16 of the Urban Mass Transit Act, and section 165(b) of the Federal-Aid Highway Act. In reversing a district court decision, the District of Columbia Court of Appeals held that the DOT could not rely on the authority of section 504 of the Rehabilitation Act to promulgate the 1979 regulations. *See, e.g., American Public Transit Ass'n v. Lewis,* 655 F.2d 1272 (D.C.Cir.1981). Because the court found that the regulations exceeded the DOT's authority to enforce section 504, the regulations were remanded to the DOT so that it could determine whether the 1979 regulations could be based on other statutory authority. *Id.* at 1280.

On July 20, 1981, the DOT deleted Subpart E of the 1979 regulation which required mass transit systems to become accessible to handicapped persons. 46 Fed. Reg. 37488 (1981). In discussing the *American Public Transit Association* case, the DOT noted that the court's decision directly affected only Subpart E of 49 C.F.R. Part 27; no other portion of the regulation was at issue in the case. 46 Fed. Reg. at 37489. In addition, the DOT wrote:

While the Court allowed the Department to consider whether section 16 and section 165, among other statutes, might support the requirements of Subpart E, we believe that these statutes do not mandate,

although they may permit, the kinds of affirmative action that Subpart E contained. 46 Fed. Reg. at 37491.

As a result, the DOT declined to maintain the "mainstreaming" requirements of Subpart E under the authority of either section 16 of the UMTA or section 165 of the FAHA. Instead, the DOT published an interim final rule (the 1981 regulation) which served to implement § 504 and effectively reverted to the former provisions in the 1976 "special efforts" regulations. 46 Fed. Reg. 37488.

The 1981 regulations, which became effective on its date of publication on July 20, 1981, replaced Subpart E of the 1979 regulations with provisions similar to those in the 1976 regulation and its appendix. The three examples of "special efforts", which are quoted above, were essentially reenacted with some minor modifications. In considering the changes in the structure and funding level of the UMTA section 5 grant program and the effects of inflation, the DOT revised the example of the expenditure of a minimum of five percent of a recipient's section 5 funding to the equivalent of a minimum of three and one-half percent of this funding. 46 Fed. Reg. at 37489. The DOT observed that three and one-half percent of contemporary section 5 funding in real dollar terms is "essentially equivalent to five percent of section 5 funding in Fiscal Year 1977, the first full fiscal year in which the 1976 UMTA regulations were in effect." Id. at 37489. With the exception of Subpart E's deletion, all other provisions of the 1979 regulation were retained including the administrative enforcement procedures in Subpart F. 49 C.F.R. §§ 27.121–.129 (1981). Under the 1981 regulation, local recipients of section 5 funds are required to certify that "special efforts" are being made in their service area to provide transportation that handicapped persons can use. 46 Fed. Reg. 37489–90 explaining 49 C.F.R. Part 27.17(a). On August 1, 1981, the Department of Justice published a notice suspending its guideline (the former HEW Guideline) which required that all transportation systems receiving federal financial assistance be made accessible to the handicapped. 46 Fed. Reg. 40687.

The local agency defendants, as well as their employees and agents, prepared the proposed "annual elements" containing specific mass transportation projects for fiscal years 1976, 1977, 1978 and 1979; those elements were submitted for funding approval to the Urban Mass Transportation Administration (UMTA) and to the Federal Highway Administration (FHWA), which is an agency of the Department of Transportation. The annual element for fiscal 1976 submitted by the RTA, CTA, and CUTD, which was approved by the federal agency defendants, contained only one project concerning the handicapped: a demonstration program consisting of 20 small, demand-responsive buses for one specific area of Chicago. (Third Amend. Complaint ¶ 42). The annual element for fiscal 1977 proposed a demonstration project of 25 small, demand-responsible buses for one area of Chicago. (Third Amend. Comp. ¶ 44). The annual element for fiscal 1978 included proposals to equip 300 buses with lifts and to make an unidentified rapid transit station in downtown Chicago accessible to the handicapped. (Complaint ¶ 46). The annual element for fiscal 1979 included the same proposal for small buses that had been proposed for 1976 and 1977, but had not yet been implemented. In addition, the 1979 annual element again proposed expenditures on making a downtown rapid transit station accessible to the elderly and handicapped. (Complaint ¶ 48).

The gist of the complaint against the local defendants is that they failed to implement the annual elements, which contained transportation improvement programs for the handicapped, for fiscal years 1976, 1977, 1978, and 1979. (Third Amend. Complaint ¶¶ 43, 45, 47, 49). Specifically, plaintiffs allege that the local defendants have failed to implement any of the special projects for the handicapped proposed in fiscal years 1976 and 1977; that they have failed to spend a vast majority of the funds allocated for projects to benefit the handicapped in fiscal 1978 and 1979; and that they have

purported to satisfy the regulatory requirements in fiscal years 1977, 1978, and 1979 by carrying over projects that had been proposed but not implemented. (Third Amend. Complaint ¶ 48).

The basis of the claim against the federal defendants is that they approved funds in fiscal years 1977, 1978 and 1979 when they knew that the local defendants had failed to implement the projects approved in prior fiscal years and that the earlier projects had not been implemented. (Third Amend. Complaint ¶ 52). Moreover, plaintiffs claim that the federal defendants approved such funds even though they knew, or should have known, that the local defendants were using the funds to purchase new vehicles and to construct mass transit facilities in violation of the applicable federal regulations.

## I. *Local Defendants' Motions to Dismiss*

Although the various local defendants have filed separate motions and supporting briefs to dismiss the Third Amended Complaint, they have asserted similar arguments in support of their position. The defendants claim that the federal statutes at issue do not provide a private right of action or that they do not permit the kind of relief sought.

### A. § 504 of the Rehabilitation Act

Judge Flaum granted the motion of defendants RTA and CTA to dismiss the original complaint brought under section 16 of the UMT Act, section 504 of the Rehabilitation Act, sections 1 and 2 of the Architectural Barriers Act, and the Fourteenth Amendment's equal protection clause. Judge Flaum found that the three statutes in question do not confer a private right of action. Shortly after the district court's decision, the 1976 regulations were promulgated.

In considering whether section 504 of the Rehabilitation Act creates a private right of action, the Seventh Circuit Court of Appeals analyzed the four factors expressed in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975) as well as the 1976 regulations. *See, e.g., Lloyd v. Regional Transp. Authority,* 548 F.2d 1277 (7th

Cir. 1977). The Court specifically noted that the HEW's proposed regulations, 45 C.F.R. §§ 84.1–84.54, intended to effectuate section 504 and to create affirmative rights under that provision. *Id.* at 1282–1283. In addition, a review of the four factors in *Cort v. Ash, supra,* supported the conclusion that section 504 confers private rights of action. First, plaintiffs were among the class specifically benefitted by the statute's enactment. Second, the 1973 legislative history of section 504 indicated that the rights of the handicapped were meant to be enforced at some point through the vehicle of a private cause of action. *Id.* at 1285–1286. Third, such a remedy was consistent with the underlying purposes of the legislative scheme because the UMTA and HEW regulations of 1976 provided affirmative rights and uniform substantive standards for meeting the needs of the handicapped in mass transportation. *Id.* at 1286. Fourth, affording a private remedy under section 504 of the Rehabilitation Act would not be the kind of suit traditionally relegated to state law.

The Seventh Circuit's holding in *Lloyd* that a private cause of action must be implied from section 504 of the Rehabilitation Act has been uniformly followed by other courts. *See, e.g., Tokarcik v. Forest Hills School Dist.,* 665 F.2d 443, 449 n.8 (3d Cir. 1981); *Camenisch v. Univ. of Texas,* 616 F.2d 127, 131 (5th Cir. 1980), *vacated and remanded on other grounds,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977); *Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977); *Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1174 n.5. The Seventh Circuit subsequently reaffirmed its holding in *Lloyd* that the Rehabilitation Act creates a private right of action and provides the handicapped with affirmative rights. *See, e.g., Adashunas v. Negley,* 626 F.2d 600, 603 (7th Cir. 1980).

Defendants correctly contend, however, that a private right of action may be limited to *a posteriori* judicial review in the event that a "meaningful administra-

tive enforcement mechanism" is promulgated. *Lloyd v. Regional Transp. Authority, supra,* 548 F.2d at 1286 n.29. The Seventh Circuit left open whether a private remedy should be limited to post-administrative judicial review after consolidated procedural enforcement regulations are issued to implement section 504; at the time of the court's decision, no such regulations existed. *Id.* at 1286 n.29. Defendants argue that the regulations promulgated since the *Lloyd* decision, such as those in 49 C.F.R. §§ 27.121–27.129, provide the type of "meaningful enforcement mechanism" that was contemplated by the Seventh Circuit. This court does not agree.

In at least two other cases, the defendants argued that other regulations implementing section 504 comprised a "meaningful enforcement mechanism." The regulations adopted by HEW under § 504, 45 C.F.R. § 84.6, incorporated by reference the administrative procedures applicable to Title VI of the 1964 Civil Rights Act, 45 C.F.R. §§ 80.6–80.10. *See, e.g., Patton v. Dumpson,* 498 F.Supp. 933, 940 (S.D.N.Y. 1980). Under those regulations, the sole administrative remedy for a violation of § 504 is a termination of federal funds to the offending agency or recipient. *Id.* at 940. No provision is made in the regulation for the complainant to furnish evidence or otherwise participate in the investigation. *Id.* at 941 citing 45 C.F.R. § 80.7(c). In addition, the complainant has no right to object to, or seek administrative review of, HEW's finding of the recipient's compliance with the regulation. *Id.* at 941 citing 45 C.F.R. § 80.7(d)(2). Because the enforcement mechanism in 45 C.F.R. §§ 80.6–80.10 did not provide a means by which the plaintiffs could activate and participate in the administrative process, the court held that it was not "meaningful" or adequate. *Id.* at 941.

The Fifth Circuit Court of Appeals reached the same result. *See, e.g., Camenisch v. University of Texas, supra,* 616 F.2d at 131–132. In holding that section 504 creates a private right of action for equitable relief, the court determined that the administrative procedures, 45 C.F.R. §§ 84.-

61 and 86.71, adopted for enforcement of section 504 do not constitute the "consolidated procedural enforcement regulations" contemplated in *Lloyd.* *Id.* at 132. The Fifth Circuit observed, however, that they reserved judgment on the question "once such consolidated procedural regulations" took effect. *Id.* at 132 n.8.

Defendants now contend that the 1981 enforcement provisions in the new regulations satisfy the *Lloyd* requirement of a "consolidated procedural regulation" or "meaningful enforcement mechanism." If so, defendants correctly assert that the proper relief under § 504 would be limited to *a posteriori* judicial review. In effect, defendants argue that plaintiffs should exhaust the administrative remedies provided in Subpart F of the 1981 regulations, 49 C.F.R. §§ 27.121–.129, before seeking judicial review.

A comparison of Subpart F, 49 C.F.R. §§ 27.121–27.129, to the enforcement provisions in 45 C.F.R. §§ 80.6–80.10 reveals that the two sets of procedures are very similar if not identical. As stated above, Subpart G, 45 C.F.R. § 84.61, expressly adopted the enforcement provisions in 45 C.F.R. §§ 80.-6–80.10 to effectuate section 504 of the Rehabilitation Act. The enforcement procedures of 45 C.F.R. §§ 80.6–80.10 were expressly held not to constitute a "consolidated" or "meaningful enforcement mechanism" as described in *Lloyd. Camenisch v. University of Texas, supra; Patton v. Dumpson, supra.* The 1981 regulations in Subpart F do not differ in any material respect from the preceding enforcement procedures in 45 C.F.R. §§ 80.6–80.10. For example, 49 C.F.R. § 27.127 is almost identical to 45 C.F.R. § 80.9 and 49 C.F.R. § 27.129 tracks the language of 45 C.F.R. § 80.10. This court must hold that Subpart F, 49 C.F.R. §§ 27.121–27.129, does not constitute a "meaningful enforcement mechanism" or "consolidated procedural regulation" for exactly the same reasons that were applied to 45 C.F.R. §§ 80.6–80.10 by the *Camenisch* and *Patton* decisions. As a result, plaintiffs' private right of action for equitable relief under § 504 is not limited

584

to *a posteriori* judicial review because of Subpart F, 49 C.F.R. §§ 27.121–27.129.

Defendants also argue that plaintiff's prayer for relief exceeds the proper scope of remedies afforded by section 504. In construing the limits of relief available under § 504, the Supreme Court observed that "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds." *See, e.g., Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369–2370, 60 L.Ed.2d 980 (1979). The Court held that § 504 did not forbid a nursing school from imposing physical qualifications for its students which prevented the admission of an applicant with a serious hearing disability. According to the Court:

> We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear . . . Identification of those instances where a refusal to accommodate the needs of a disabled person amounts to discrimination against the handicapped continues to be an important responsibility of HEW. *Id.* at 412–413, 99 S.Ct. at 2370.

As stated above, the District of Columbia Court of Appeals struck the validity of the 1979 "mainstreaming" regulations on the ground that they exceeded the scope of relief allowed by § 504. *American Public Transit Ass'n v. Lewis, supra.* In applying the standards of the *Davis* decision, Judge Mikva noted for the majority that the 1979 DOT rules did not mandate only modest expenditures, but required extensive modifications of existing systems and imposed extremely heavy financial burdens on local transit authorities. *Id.* 655 F.2d at 1278. Specifically, every new bus or subway car must be accessible to wheelchairs regardless of cost; elevators and other modifications must be added to existing subways. *Id.* at 1278. These were the kind of burdensome modifications that the *Davis* court held to be beyond the scope of § 504, and the validity of the 1979 regulations could not be sustained under the authority of § 504 or the HEW guidelines.

No party in this action contends that the "full accessibility" or "mainstreaming" provisions in the 1979 regulations ought to apply to the defendants' conduct. The validity of those regulations was stricken precisely because they required local transit agencies to make *all* facilities and vehicles accessible to the handicapped and elderly; such a requirement was deemed unduly burdensome. Furthermore, the DOT itself, in response to the *APTA* decision, made no attempt to sustain the 1979 regulations under other statutory authority. Instead, the DOT promulgated new 1981 regulations which effectively reenacted the 1976 "special efforts" regulations. The parties in the instant case agree that the defendants' conduct ought to be assessed, if at all, under the standards established in the "special efforts" regulations. (Plaintiffs' Memo. in Response to Federal Defs. Motion for Summary Judgment at 16). Nevertheless, plaintiffs seek as part of their relief that local agency defendants make "*all* buses, rapid transit facilities, and fixed facilities purchased, modified or constructed, since May 1, 1976, accessible to the handicapped." (Third Amend. Compl., Prayer for Relief, ¶ 5(b)). Such relief exceeds the scope of § 504 for the reasons stated in *American Public Transit Ass'n v. Lewis.* Moreover, the full accessibility standard did not apply to projects undertaken before 1979, and that standard became invalid after the *APTA* decision. Paragraph 5(b) of the Prayer for Relief cannot be sustained under the authority of § 504.

The plaintiffs do not contend that the annual elements or TIPs for fiscal years 1976–1979 failed either to satisfy the "special efforts" requirements of the 1976 regulations or to comply with the statutory schemes. Rather, plaintiffs seek to have the defendants implement those annual elements. For that reason, plaintiffs are certainly not seeking massive relief involving inordinate expenses; they seek to compel compliance with the 1976 regulations through the implementation of the annual

TIPs that were expressly approved by the federal defendants and submitted by the local defendants. Defendants cannot contend that the relief sought in Paragraph 5(a) of the Third Amended Complaint is excessive or unreasonable. Those programs were designed to comply with the "special efforts" requirements of the 1976 regulations, which were at all times valid. The case would be different if the annual elements at issue were intended to comply with the "mainstreaming" requirements of the 1979 regulations that were subsequently invalidated by the District of Columbia Court of Appeals and withdrawn by the DOT. Section 504 does permit the kind of relief sought in paragraph 5(a) of the plaintiffs' Prayer for Relief.

### B. § 16 of the UMT Act

■ This court's research reveals that only two published decisions have determined whether § 16 of the Urban Mass Transportation Act of 1964 grants plaintiffs a private right of action to enforce compliance with its provisions. *See, e.g., Associated Businesses of Franklin v. Warren,* 522 F.Supp. 1015 (S.D.Ohio 1981); *Dopico v. Goldschmidt, supra.* Both of those courts held that no private right of action exists under § 16 of the UMT Act.[2]

■ It is well established that *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), sets out the relevant factors used to determine whether a federal statute includes a private right of action. *Lloyd v. Regional Transp. Authority, supra,* 548 F.2d at 1284. The first factor is whether the plaintiff is one of the class for whose especial benefit the statute was enacted. *Id.* at 1284. The language of the statute makes it clear that it was enacted for the benefit of the handicapped and elderly in the use of mass transportation. *Dopico v. Goldschmidt, supra.* Unlike the plaintiffs in *Associated Businesses of Franklin v. Warren, supra,* who were mass transporta-

tion providers, the plaintiffs here are the obvious beneficiaries of the Act as potential users of public transportation.

■ Although plaintiffs are members of the benefitted class, that factor alone does not end the inquiry. Supreme Court cases subsequent to *Cort v. Ash* have plainly stated that the focus must be on "the intent of Congress." *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* —— U.S. ——, 102 S.Ct. 1825, 1838–39, 72 L.Ed.2d 182 (1982). Further, the ultimate question is whether Congress intended the Act to be enforced through private litigation. *Dopico, supra,* 518 F.Supp. at 1172. As the Supreme Court recently observed, when Congress enacts new legislation, the question is whether Congress intended to create a private remedy as a supplement to the express provisions of the statute. *Curran, supra,* 102 S.Ct. at 1839.

The Supreme Court consistently has found that Congress intended to create a cause of action where the language of the statute explicitly confers a right directly on a class of persons that includes the plaintiff in the case. *See, e.g., Universities Research Ass'n v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 1462, 67 L.Ed.2d 662 (1981). Conversely, the Court has noted that there "would be far less reason to infer a private remedy in favor of individual persons" where Congress, rather than drafting the legislation "with an unmistakable focus on the benefited class", instead has framed the statute simply as a general prohibition or a command to a federal agency. *Id.* 101 S.Ct. at 1462 citing *Cannon v. University of Chicago,* 441 U.S. 677, 690–92, 99 S.Ct. 1946, 1954–55, 60 L.Ed.2d 560 (1979). Section 16 declares a national policy that elderly and handicapped persons have the same right as others to use mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transit facilities in order to make them accessible to the elderly and the handicapped;

---

2. Although *Michigan Paralyzed Veterans of America v. Coleman,* 451 F.Supp. 7 (E.D.Mich. 1977), relied on the *Lloyd* case to hold that Section 504 of the Rehabilitation Act confers a cause of action upon private parties, the court did not expressly consider whether § 16 of the UMT Act creates a private right of action. In a recent order of July 29, 1982, however, the same court held that § 16 does not create a private right of action.

and that all federal programs offering assistance in mass transportation should contain provisions implementing that policy. 49 U.S.C. § 1612(a). Further, § 16 authorizes the Secretary of Transportation to make grants and loans to local and state agencies in order to assist them in providing mass transportation services to the elderly and handicapped. 49 U.S.C. § 1612(b). Although Section 16 of the UMT Act promotes a national policy to facilitate the use of mass transportation by the elderly and handicapped as well as to authorize federal grants and loans to state agencies for that purpose, it does not confer rights directly on those individuals. Because section 16 is phrased more as a directive or a general command to a federal agency engaged in the disbursement of public funds, its language provides no support for the implication of a private remedy. *See Universities Research Ass'n v. Coutu, supra,* 101 S.Ct. at 1462.

The legislative history of the UMT Act provides no indication, explicit or implicit, of an intent to create or to deny a private cause of action in favor of the Act's beneficiaries. *See Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1172. Section 16 was introduced to the House by Representative Biaggi, who viewed it as continuing the federal policy of removing structural barriers to mass transportation facilities. *Id.* at 1172 n.42 citing 116 Cong. Rec. 34180–81 (1970). Although Congress evinced a concern with protecting handicapped mass transportation users, the UMT Act was enacted to provide "efficient transportation that meets a variety of personal and social needs". 1978 U.S. Code Cong. & Ad.News 6575, 6640. The avowed purposes of the Act were to assist in the development of improved mass transportation services, to encourage the planning of areawide urban mass transit systems, and to provide assistance to state and local governments in financing such systems operated by public or private companies. 49 U.S.C. § 1601(b). There is no language either in the Act or in its legislative history indicating an intent to create a private action on behalf of elderly or handicapped users.

Further, this court agrees with Judge Weinfeld's conclusion that it would not be consistent with the underlying purpose of the legislation to imply a private right of action in favor of the plaintiffs. *See, e.g., Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1173. In order to qualify for federal financial aid, local transit agencies must satisfy complex requirements under regulations involving difficult administrative decisions; federal agencies, in turn, must determine whether the local agencies adequately fulfill statutory and regulatory requirements. *Id.* at 1173. In view of the complex nature of decisionmaking for federal financial assistance, the implication of a private cause of action under section 16 would serve to interfere with local and administrative decisions and "would risk the possibility of inconsistent results in different areas of the country". *Id.* at 1173.

Neither the language nor the legislative history of the UMT Act suggests that the Act was intended to create federal rights for especial benefit of a class of persons but rather was intended to benefit the public at large through a general regulatory scheme to be administered by the Secretary of Transportation. Because there is no indication of congressional intent to create a remedy for transportation users who benefit from the Act, this court concludes that Section 16 of the UMT Act does not imply a private right of action.

C. § 165(b) of Federal-Aid Highway Act

■ The Federal-Aid Highway Act of 1973, as amended in 1974, provides that transportation projects funded under that Act must be planned, designed, constructed, and operated to allow effective utilization by the non-ambulatory wheelchair-bound, among others, and that the Secretary of Transportation shall not approve any program not complying with those provisions. *Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1167 citing Pub.L.No.93–87, § 165(b), as amended by Pub.L.No.93–643, § 105. As with section 16 of the UMT Act, section 165(b) of the FAHA is merely one part of a massive funding statute; it identifies an

area in which policy dictates that federally funded construction should mandate various kinds of benefits for the elderly and handicapped. *Id.* at 1178. In support of that view, the legislative history indicates that Congress recognized that funds in the highway trust fund could be used for mass transportation, and it directed a federal-state evaluation of the localities' needs with respect to mass transportation. *Id.* at 1178 citing H.Rep.No.93–118 reprinted in [1973] U.S.Code Cong. & Ad.News 1859, 1885–86. The focus was not on creating rights for the elderly and handicapped. *Id.* at 1178. When Congress amended the section in 1974, it added a provision that is virtually identical to § 16 of the UMT Act, which, as this court concluded, created no substantive rights for plaintiffs. *Id.* at 1178.

Although Section 165(b) of the FAHA requires that certain programs receiving federal funds must be implemented to allow effective use by the elderly and handicapped, it does not confer rights directly on those individuals. *Cf. Universities Research Ass'n v. Coutu, supra,* 101 S.Ct. at 1462. Because Section 165(b) is phrased as a general directive to a federal agency engaged in the disbursement of public funds, its language provides no support for the implication of a private remedy. *Id.* at 1462.

### D. 42 U.S.C. § 1983

■ The local defendants also contend that plaintiffs do not state a claim for relief under 42 U.S.C. § 1983. The Supreme Court held in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), that § 1983 encompasses deprivations of rights secured by all "laws" of the United States. Because neither § 16 of the UMT Act nor § 165(b) of the FAH Act create substantive rights that can be enforced through § 1983, it is clear that those statutes provide no basis for the § 1983 claim.

In addition, Judge Weinfeld correctly held that plaintiff had failed to state an equal protection claim under § 1983 because no constitutional right was at stake. *Dopico v. Goldschmidt, supra,* 518 F.Supp. at 1178. No fundamental right was in-

volved because wheelchair users are not a suspect class. *Id.* at 1178. As a result, the actions of local officials are constitutionally valid as long as there is a rational basis for the challenged actions and classifications. *Id.* The allegations with respect to the defendants' failure to implement the annual projects do not suggest that the local officials had any improper motives guiding their decisions. *Id.* The conclusory allegation that the local defendants have discriminated against plaintiffs is not sufficient to sustain the § 1983 claim.

### E. Individual Capacity of Defendants

■ The administrators of the local agency defendants are sued in both their official and individual capacities. The facts asserted in the Third Amended Complaint, including the prayer for relief, concern only the actions of the administrators and board members of the CTA, RTA and other agency defendants in their official capacities. *See, e.g. Vanko v. Finley,* 440 F.Supp. 656, 659–60 (N.D.Ohio 1977). Because relief is solely equitable and of the character which only the corporate body of the RTA or CTA can furnish, the complaint is dismissed against the local agency administrators in their individual (but not official) capacities. *Id.* at 660.

### II. *Federal Defendants' Motion for Summary Judgment*

■ The analysis made with respect to the local agency defendants' motion to dismiss in Part I applies with equal force to the same claims against the federal defendants. Count IV of the Third Amended Complaint, however, asserts that the federal agency defendants have violated the various statutes and applicable regulations by approving grants to the local defendants despite the alleged failure to provide accessible transportation facilities and to implement the annual elements that were approved. The federal defendants move for summary judgment on the ground that they complied with the applicable statutory and regulatory requirements, and that their approval of the financial grants to the local agencies was not "arbitrary or capricious"

under the standards of § 10 of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

A number of cases have held that plaintiffs have standing to contest the validity of the federal agencies' action in approving the grants. *See, e.g., Baker v. Bell,* 630 F.2d 1046, 1050 (5th Cir. 1980); *Vanko v. Finley,* 440 F.Supp. 656, 659 (N.D.Ohio 1977); *Bartels v. Biernat,* 405 F.Supp. 1012, 1015 (W.D.Wis.1975). In *Baker v. Bell, supra,* the Fifth Circuit Court of Appeals found that the plaintiffs, who were mobility-disabled persons confined to wheelchairs, satisfied the three-part test for standing to review agency action established in *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) and *Association of Data Processing Serv. Organ., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970): (1) the challenged action must result in injury-in-fact to the plaintiffs; (2) the interest invaded must be arguably within the zone of interest to be protected by the statute; and (3) there must be no statutory prohibition of judicial review. *Id.* 630 F.2d at 1050. First, the injury-in-fact consists of the direct and personal loss the plaintiffs suffer if they are unable to use public transportation. *Id.* at 1051. Second, the plaintiffs' interest in access to and use of mass transportation is clearly within the "zone of interests" protected by § 504 of the Rehabilitation Act. A person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof" under Section 10(a) of the Administrative Procedure Act, 5 U.S.C. § 702. *Association of Data Processing Serv. Organ., Inc. v. Camp, supra,* 397 U.S. at 153, 90 S.Ct. at 829. Third, there is no indication that judicial review of agency action under the Rehabilitation Act is prohibited. As a result, plaintiffs have standing to contest the validity of the agencies' approval of the grant application in this case.

## A. Scope of Review

■ Plaintiffs contend that the federal agencies' action is entitled to *de novo* review by this district court where enforcement of § 504 of the Rehabilitation Act is pursued. In support of that claim, plaintiffs rely upon *Baker v. Bell, supra,* 630 F.2d at 1056–57. The Fifth Circuit Court of Appeals held that the narrow review standards of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* ought not to apply to judicial review of agency action where the underlying claim is based upon § 504 of the Rehabilitation Act, but that the APA standards should apply to the same review of agency action where the underlying action is based upon § 16 of the UMT Act. In making that dubious distinction, the Court of Appeals misconstrued both the express terms of the Administrative Procedure Act and the reasoning of the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The plaintiffs challenge the action of the DOT, UMTA, the FHWA and their officials. Section 701 of the APA, 5 U.S.C. § 701, provides that the action of "each authority of the government of the United States", which includes the DOT, the UMTA, and the FHWA, is subject to judicial review except where there is a statutory prohibition on review or "where agency action is committed to agency discretion by law." *Id.* at 410, 91 S.Ct. at 820. In this case, there is no contention that Congress sought to prohibit judicial review and there is certainly no "showing of 'clear and convincing evidence' of a . . . legislative intent" to restrict access to judicial review. *Id.* at 410, 91 S.Ct. at 820.

Similarly, the federal agencies' decision to approve grants to the local defendants for mass transportation does not fall within the very narrow exception for action "committed to agency discretion." *Id.* at 410 n.23, 91 S.Ct. at 820 n.23. The legislative history of the APA indicates that the exception applies to those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Id.* at 410, 91 S.Ct. at 821 citing S.Rep.No.752, 79th Cong., 1st Sess., 26 (1945). The agencies' action here was at all times governed by comprehensive statutory

and regulatory provisions that did not vest the decision to approve the funds and programs in the agencies' discretion.

Although plaintiffs failed to make the argument, this court notes that they could have sought *de novo* review to determine whether the agencies' action was "unwarranted by the facts" under § 706(2)(F) of the APA. *De novo* review of whether the federal agency's decision was "unwarranted by the facts" is authorized by § 706(2)(F) in only two circumstances. First, such *de novo* review is proper where the action is adjudicatory in nature and the agency factfinding procedures are inadequate. Second, there may be independent judicial factfinding where issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. *Id.* at 415, 91 S.Ct. at 823 citing H.R.Rep.No.1980, 79th Cong., 2d Sess.; *also see Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973). Neither situation is present here. This court must conclude that the Administrative Procedure Act applies to judicial review of the actions and the decision made by the administrators of the DOT, the UMTA, and the FHWA.

In reviewing the federal agencies' approval of the grants, this court must determine whether the agencies' findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." *Id.* at 416, 91 S.Ct. at 823 citing 5 U.S.C. § 706(2)(A). In order to make this finding, the court must consider whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The ultimate standard of review is a narrow one; the court is not empowered to substitute its judgment for that of the agency. *Id.* at 416, 91 S.Ct. at 823–24. Because plaintiffs do not contend that the federal agencies or their administrators acted beyond the scope of their authority, the only remaining inquiry is whether the agencies' action complied with the necessary procedural requirements. *Id.* at 415–417, 91 S.Ct. at 823–24.

**B. Adequacy of Administrative Record**

 Plaintiffs contend that the administrative record before the court is incomplete, and that a proper review of the agencies' action cannot be made. The Supreme Court has clearly held that the "whole" administrative record compiled by the agency is required as a basis for review under § 706 of the Administrative Procedure Act. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 419, 91 S.Ct. at 825. In that case, for example, the Court found that affidavits filed in support of the litigation constituted *"post hoc"* rationalizations that formed an inadequate basis for review. *Id.* In remanding the case to the district court, the Supreme Court directed that the plenary review to be undertaken by the lower court must be based "on the full administrative record that was before the Secretary at the time he made his decision." *Id.* at 420, 91 S.Ct. at 825.

The subsequent decision in *Camp v. Pitts, supra,* does not hold otherwise. In that case, "the entire administrative record was placed before the court" for its review. *Id.* at 139, 93 S.Ct. at 1242. The Court held that where an agency made a contemporaneous explanation for its challenged decision, the validity of the agency's action must stand or fall on the propriety of that finding judged by the appropriate standard of review. *Id.* at 143, 93 S.Ct. at 1244. If that finding is not sustainable on the administrative record made, then the agency's decision should be vacated and remanded. *Id.* The Supreme Court did not suggest that judicial review of an agency action, even where a contemporaneous explanation was made, can be based on anything less than the full administrative record. Indeed, the full record had been submitted at all levels of judicial review.

In applying the "arbitrary and capricious" standard of review to an agency action, Judge Skelly Wright of the District of Columbia Court of Appeals observed that the standard requires the court to make a "searching and careful" inquiry of the record in the case in order to ensure both that the agency had "adequately considered all relevant factors ... and that it has demon-

strated a 'rational connection between the facts found and the choice made' ". *See U. S. Lines v. Federal Maritime Commission,* 584 F.2d 519, 533 (D.C.Cir.1978). Such review of the record, however, cannot be made where the data relied on by the federal agency in reaching its decision is not included in the administrative record and is not disclosed to the court. *Id.* at 533. The reason is that the court cannot determine whether the final agency decision reflects the rational outcome of the agency's consideration of all relevant factors when the court has no idea what factors or data were in fact considered by the agency. *Id.* at 533 [cites omitted]. In assessing whether the agency's action was arbitrary and capricious, the court must test the action against the "full administrative record that was before the [agency official] at the time he made the decision." *Id.* at 534 n.43 citing *Citizens to Preserve Overton Park, supra.*

Although the federal defendants apparently concede that the "full administrative record" is not before the court, they contend that the documents exceeding one hundred pages, which were attached as exhibits to their motion, are adequate to permit judicial review. The complete administrative record consists of all the documents and materials that were directly or indirectly considered by the decision-makers at the time the decisions were rendered. *See, e.g., Tenneco Oil Co. v. Dept. of Energy,* 475 F.Supp. 299, 317 (D.Del.1979). In the present case, it appears that the exhibits attached to the federal defendants' motion do not comprise the entire administrative record. Further, it would be improper for this court to allow the federal defendants to determine unilaterally what shall constitute the administrative record and thereby limit the scope of the court's inquiry. *Id.* at 317. For that reason, plaintiffs are entitled to discover any materials, including internal memoranda, guidelines, or hearing transcripts, that are necessary to complete the administrative record. *Id.*

The federal defendants correctly observe that they may be permitted to offer affidavits or live testimony in order to explain the record, but that the court may not engage in a *de novo* review of the administrative actions. *See Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244. It bears emphasis, perhaps, that this court intends to review the federal agency decisions under the narrow standards of § 706 of the APA rather than to embark on a full-blown review of the agency actions. Such limited review under the APA is inappropriate, however, in the absence of the full administrative record.

Even assuming that the whole administrative record is present, this court cannot conclude that the federal defendants are entitled to summary judgment at this juncture. The gist of plaintiffs' claim against the federal defendants is that the agencies approved the funds for fiscal years 1977, 1978, and 1979 when they knew or should have known that projects programmed in prior fiscal years had not been implemented. One of the applicable regulations, 49 C.F.R. § 613.204 (1975), provides in part that:

> The Urban Mass Transportation Administrator will grant project approvals pursuant to 23 C.F.R. § 450.320(a)(3) only if: (a) The urban transportation planning process exhibits satisfactory special efforts in planning public mass transportation facilities and services that can be utilized by elderly and handicapped persons; and
>
> * * * * * *
>
> (c) After September 30, 1977, reasonable progress has been demonstrated in implementing previously programmed projects. 49 C.F.R. § 613.204.

In considering any annual elements or TIPs proposed after September 30, 1977, the UMTA could only approve the grants so long as "reasonable progress" had been demonstrated by the recipients in the implementation of previously programmed projects.

The annual element of the TIP for fiscal year 1976 proposed the purchase of 20 small, demand-responsive buses that could transport handicapped users in one specific area of Chicago. The TIP proposed for fiscal year 1977 was similar because it described a project to acquire 25 demand-responsive buses. In the TIP for fiscal year

1978, the local agencies proposed to equip 300 buses with lifts and to make an unidentified rapid transit station in Chicago's Loop accessible to the handicapped. Significantly, the TIP for the 1979 fiscal year sought to acquire the demand-responsive buses that were proposed but not obtained in fiscal years 1976 and 1977; furthermore, the project repeated the proposal to make a rapid transit station in downtown Chicago accessible.

On March 15, 1979, the Regional Director of the Urban Mass Transportation Administration wrote a letter to the Chairman of the RTA concerning the proposed "special efforts" projects for the handicapped in the fiscal year 1979 TIP. (Defs. Exh. 3b). The UMTA Director wrote that "the major elements of special efforts projects programmed in FY 78 AE [Fiscal Year 1978 Annual Element], specifically, the purchase of lift-equipped buses and CTA transit station access improvements have not been implemented." Further, the fiscal year 1979 annual element contained a project for thirty accessible buses; according to the UMTA director's letter, that project, as measured by the 5% value needed to spend from the total of the fiscal year's section 5 funds, fell far short of the minimum requirement. In closing, the director wrote that UMTA approval of the proposed 1979 TIP may be foreclosed in the absence of a "satisfactory resolution of this matter." In its subsequent approval of the 1979 annual element on June 29, 1979, the UMTA indicated that it did not find "evidence of a well formulated program of projects that integrates the various efforts and moves to some clear objectives"; at the same time, the regional director wrote that "the Mobility Limited Plan and its elements are being selectively implemented and for the most part only in a minimal manner." (Def. Exh. 3d). In view of those letters from the UMTA's regional director to both the RTA and the CATS, this court cannot conclude that the UMTA approved the 1979 annual element in compliance with the requirement of 49 C.F.R. § 613.204(c), which conditions approval upon the demonstration of "reasonable progress" in implementing previously programmed projects.

As a practical matter, some of plaintiffs' claims may now be moot. For example, it is possible that some if not all of the projects proposed in fiscal years 1977, 1978, 1979, and 1980 have been implemented. Furthermore, the local agency defendants might have appropriately spent the 7.6 million dollars, as required by the UMTA in 1980, by the date of this order. This court will take such considerations into account when and if a remedy must be fashioned.

III.

For the foregoing reasons, the defendants' motions to dismiss the Third Amended Complaint are granted in part and denied in part. The claims based upon § 16 of the Urban Mass Transportation Act, upon § 165 of the Federal-Aid Highway Act of 1973, and upon 42 U.S.C. § 1983 are dismissed. Paragraph 5(b) of the Prayer for Relief in the Third Amended Complaint is dismissed. The claims against the administrators of the defendants are dismissed insofar as they pertain to their individual capacities. The motions to dismiss are otherwise denied.

The federal defendants' alternative motion for summary judgment is denied.